[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 7, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-10216
Non-Argument Calendar

_____

D. C. Docket No. 03-02989-CV-UWC-W

LAQUARIUS GRAY,
a minor, by and through her mother and
next friend, Toniko L. Alexander,

Plaintiff-Appellee,

versus

ANTONIO BOSTIC,
individually and in his official capacity
as Deputy Sheriff for Tuscaloosa County, AL,
EDMUND SEXTON,
individually and in his official capacity
as Principal of Holt Elementary School,
Tuscaloosa, AL,

Defendants-Appellants,

JOYCE SELLERS, individually and in her official
capacity as Superintendent of Tuscaloosa County,
AL, School System and/or Tuscaloosa County, AL,
Board of Education, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

**(August 7, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

HULL, Circuit Judge:

This is the second appeal involving the detention and handcuffing of a nine-year-old student, Laquarius Gray, during her physical education class. The first time, we reversed the district court's Rule 12(b)(6) dismissal of this § 1983 action. Gray v. Bostic, No. 04-12240 (11th Cir. Dec. 27, 2004). This time, the defendants appeal the district court's denial of their motions for summary judgment based on qualified immunity. After review, we affirm in part and reverse in part.

## I. BACKGROUND

**A.     The Incident**

Coach Lattuce Greer Williams believed that Gray was not doing "jumping jacks" along with the rest of the physical education class. Coach Williams told Gray she needed to do her exercises. When Gray failed to comply, Coach Williams told Gray to "[c]ome to the wall" of the gym. Williams testified that as Gray walked to the wall, "[s]he told me that she would punch me or hit me, hit me

2

in the face." A nearby teacher, Coach Tara Horton, witnessed the disagreement with Coach Williams. Coach Horton testified that Gray said, "I bust you in the head," which Coach Horton explained meant that "she was going to hit him in the head." Although Coach Williams and Coach Horton attribute slightly different language to Gray, the gist of their testimony is that Gray threatened to hit Coach Williams.

In contrast, Gray testified that she did not threaten to "bust" Coach Williams in the head. Although Gray could not remember what she said, she agreed that she threatened to "do something" to Coach Williams and that what she said was disrespectful, as follows:

> Q: Then, [Coach Williams] told me that, at that point, you told him that you were going to bust him in his head; is that right?
> A: No, sir.
> Q: You didn't say that?
> A: No, sir.
> Q: Is Coach Williams lying to me?
>     MR. LIVEOAK: Objection
> Q: (By Mr. Wisdom) You can answer. Is Coach Williams telling me a lie?
> A: I guess he did. I don't remember what I said, but I didn't say that.
> Q: You don't remember what you said?
> A: (Witness shakes head.)
> Q. You don't have any idea what you said?
>     MR. LIVEOAK: Is that no?
> A: No.
> Q: (By Mr. Wisdom) So, you don't know if you said that you might punch him; is that right: Did you say something to him that was disrespectful?

A: Yes, sir.
Q: What was that?
A. I don't remember.
Q. Did you tell him that you might do something to him?
A. Yes, sir.
. . . .
Q: What did you tell him that you were going to do to him?
A. I don't remember.[1]

Because of the summary judgment posture of the case, we construe Gray's testimony as denying the coaches' version of what she said. However, Gray does not dispute that she threatened to "do something" physically to Coach Williams. Thus the precise nature of her physical threat – whether it was to hit him in the face, poke him in the eye or kick him in the shins – does not change our analysis.

After hearing Gray's threat to Coach Williams, Coach Horton instructed Gray to come over to her. Coach Williams then turned his attention back to his class.

Deputy Antonio Bostic also witnessed the exchange between Gray and Coach Williams. Deputy Bostic was employed as a Tuscaloosa County Sheriff's Deputy and served as a school resource officer ("SRO") for several schools, including Holt Elementary. Before Gray reached Coach Horton, Deputy Bostic

---

[1]In the first appeal of the Rule 12(b)(6) dismissal, we reviewed the allegations in the complaint, which stated only that Gray made a "disrespectful comment" to Coach Williams. We noted that at the Rule 12(b)(6) juncture, there was no allegation of profanity or fighting words or that Gray was a danger to any teacher or student. Gray, No. 04-12240, slip op. at 14, 17. Now, at the summary judgment juncture, we have deposition testimony as to what was said and the context in which it was said.

4

intervened and told Coach Horton that he would talk to Gray. Coach Horton insisted that she would handle the matter. However, Deputy Bostic insisted that he would handle Gray and escorted Gray out the gym door into a lobby area.

Deputy Bostic told Gray to turn around, pulled her hands behind her back and put Gray in handcuffs. Deputy Bostic tightened the handcuffs to the point that they caused Gray pain. Deputy Bostic told Gray, "[T]his is how it feels when you break the law," and "[T]his is how it feels to be in jail." Gray began to cry. Gray stood with the handcuffs on for not less than five minutes, with Deputy Bostic standing behind her.[2]

In discovery responses, Deputy Bostic averred that he detained and handcuffed Gray "to impress upon her the serious nature of committing crimes that can lead to arrest, detention or incarceration" and "to help persuade her to rid herself of her disrespectful attitude." Deputy Bostic's discovery responses also stated that he "did not feel the need to apologize to LaQuarius Gray for telling her that she committed a misdemeanor in my presence and showing her what would

---

[2]There is a factual dispute about how long Gray was in handcuffs. As to time, Gray testified that she did not know how long she stood in handcuffs. However, Gray was asked whether it was "less than five minutes," and replied "No, sir." When Coach Horton was asked how long Gray was in handcuffs, she responded, "I'm going to guestimate two minutes maybe." Deputy Bostic averred that he "detained [Gray] for less than 30 seconds . . . ." At the summary judgment stage, however, we must review the evidence in a light most favorable to Gray and assume that Gray was handcuffed for not less than five minutes.

5

happen if a less generous officer than I were to arrest her for her actions."[3]  After Deputy Bostic took the handcuffs off, Gray went to the Coaches' Office until her next class.

Neither Coach Horton nor Coach Williams was afraid of Gray or believed that Gray would actually carry out her threat.  When asked whether he was "ever afraid that [Gray] would commit an act of violence towards [him] or Ms. Horton," Coach Williams replied, "No, sir."  Similarly, Coach Horton replied "No,' when asked if she was "ever afraid that Ms. Gray would physically assault you or another student?"  When asked, "[W]hen Ms. Gray told Coach Williams that she was going to bust him in the head she's not actually physically capable of doing that, is she," Coach Horton agreed.  Coach Horton planned to talk with Gray about the incident and give her a warning.  Coach Horton testified that she would not have been required to write Gray up, give Gray detention, or send her to the principal's office "because it wasn't that major."

B.    **Court Proceedings**

On November 4, 2003, by and through her mother, Gray filed suit against Deputy Bostic and Tuscaloosa County Sheriff, Edmund Sexton in their official and

---

[3]Deputy Bostic was never deposed and did not file a declaration in support of his motion for summary judgment.  Therefore, the only sworn statement from Deputy Bostic relating to the events is contained in his interrogatory responses.

6

individual capacities.[4]  Gray's complaint contained eight counts, including claims: (1) under 42 U.S.C. § 1983 for violations of Gray's First, Fourth, Fifth, Eighth and Fourteenth Amendment rights (Count 1); (2) under 42 U.S.C. § 1981 for race discrimination (Count 2); and (3) under state law for invasion of privacy, assault and battery, false imprisonment, defamation and intentional infliction of emotional distress (Counts 4 through 8).  Gray also sought declaratory and injunctive relief (Count 3).  The defendants filed a motion to dismiss, which the district court granted.

Gray appealed to this Court, challenging only the district court's dismissal of her Fourth Amendment claims against Deputy Bostic and Sheriff Sexton individually and the denial of her motion for leave to amend her complaint.[5]  We reversed, stating that on remand Gray was entitled to pursue her Fourth Amendment claims against defendants Deputy Bostic and Sheriff Sexton individually and to file an amended complaint.  Gray, No. 04-12240, slip op. at 22.  The district court ordered Gray to file an amended complaint asserting only the Fourth Amendment claims that remained following her appeal.  Gray then

---

[4]Gray's original complaint also alleged claims against Joyce Harris, Holt Elementary School's principal; Joyce Sellers, the Tuscaloosa County School Superintendent; and members of the Tuscaloosa County Board of Education.  Gray subsequently dismissed these claims.

[5]In the prior appeal, Gray did not challenge the dismissal of her First, Fifth, Eighth and Fourteenth Amendment claims, her state law claims or her official capacity claims against Deputy Bostic and Sheriff Sexton.

amended her complaint, asserting claims of excessive use of force and unreasonable seizure against defendants Bostic and Sexton individually.

Following discovery, the defendants moved for summary judgment based on qualified immunity. The district court denied the motion, prompting this interlocutory appeal.

## II. STANDARD OF REVIEW

Although the denial of summary judgment generally is not a final appealable order subject to immediate appeal, an interlocutory appeal may be taken where the district court denies the defense of qualified immunity and the appeal involves a question of law. McMillian v. Johnson, 88 F.3d 1554, 1563, amended on other grounds, 101 F.3d 1363 (11th Cir. 1996). We review de novo a district court's denial of summary judgment based on qualified immunity, viewing the evidence in a light most favorable to the opposing party. Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1266-67 (11th Cir. 2003).

## III. DISCUSSION

### A. Qualified Immunity Principles

"Qualified immunity offers a complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting

Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). To be

entitled to qualified immunity, the defendant must prove that he was acting within

the scope of his discretionary authority. Id. "Once the defendants establish that

they were acting within their discretionary authority, the burden shifts to the

plaintiff to demonstrate that qualified immunity is not appropriate." Lumley v.

City of Dade City, 327 F.3d 1186, 1194 (11th Cir. 2003).

The Supreme Court has established a two-part test to evaluate whether an

official is entitled to qualified immunity. First, as a threshold inquiry, we address

whether the facts presented, taken in a light most favorable to the non-moving

party, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201, 121

S. Ct. 2151, 2156 (2001). If we answer this question in the affirmative, then we

"ask whether the right was clearly established." Id.

**B.      Deputy Bostic's Discretionary Authority**

Gray argues that Deputy Bostic was not acting within the scope of his

discretionary authority when he detained and handcuffed Gray. "To establish that

the challenged actions were within the scope of his discretionary authority, a

defendant must show that those actions were (1) undertaken pursuant to the

performance of his duties, and (2) within the scope of his authority." Habert Int'l

9

v. James, 157 F.3d 1271, 1282 (11ᵗʰ Cir. 1998).  To that end, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties."  Id. (quotation marks omitted).

Although our prior opinion concluding that Deputy Bostic was acting within his discretionary authority was at the Rule 12(b)(6) stage and was based on merely the allegations in the complaint, there is no evidence at the summary judgment stage that changes our conclusion.  Deputy Bostic as an SRO, was charged with the responsibility to investigate criminal activity that might be taking place at Holt Elementary School.  As part of that responsibility, Deputy Bostic's duties included, under the right circumstances, detaining and questioning students and possibly arresting and handcuffing them.  The fact that the right circumstances (for detention or handcuffing) may not have been present in this case is irrelevant to our inquiry.  See id. (explaining that the "inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act" because "[f]ramed that way, the inquiry is no more than an 'untenable' tautology").

Gray stresses that SROs were not supposed to discipline students and that Deputy Bostic admitted in his interrogatory responses that his reasons for detaining and handcuffing Gray were to "impress upon her the serious nature of committing

10

crimes that can lead to arrest, detention or incarceration" and "to help persuade her to rid herself of her disrespectful attitude." We note, however, that it is also clear from Deputy Bostic's interrogatory responses that he believed Gray had committed a misdemeanor when she threatened her teacher and that Deputy Bostic detained her to discuss the incident with her. Therefore, we conclude that Deputy Bostic's actions were within his discretionary duties and turn to whether his actions were unconstitutional.

## C.    Constitutional Violations

Gray argues that Deputy Bostic used excessive force in detaining her because he lacked a right to detain her at all. Therefore, her excessive force claim is not an independent claim, but rather is subsumed in her illegal seizure claim. See Bashir v. Rockdale County, 445 F.3d 1323, 1331 (11th Cir. 2006) (stating that "[u]nder this Circuit's law . . . a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim" (quotation marks omitted)).[6] Thus, our inquiry focuses on Deputy Bostic's seizure of Gray.

As stated in Gray's earlier appeal, we apply the reasonableness standard

---

[6]Although Gray alleges that Deputy Bostic tightened the handcuffs enough to cause her pain, she has not argued that the handcuffing constituted excessive force even if Deputy Bostic's stop was supported by reasonable suspicion.

articulated in New Jersey v. T.L.O., 469 U.S. 325, 341-42, 105 S. Ct. 733, 742-43 (1985), to school seizures by law enforcement officers. See Gray, No. 04-12240, slip op. at 14. In T.L.O, the Supreme Court recognized that the substantial need to maintain discipline in the classroom and foster a positive learning environment "requires some modification of the level of suspicion of illicit activity needed to justify a search" in the public school setting. Id. at 340, 105 S. Ct. at 742. To that end, the Supreme Court concluded that "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause." Id. at 341, 105 S. Ct. at 742. Instead, under T.L.O.'s reasonableness standard, "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." Id. Under the T.L.O standard, the reasonableness of the search is evaluated using a two-step inquiry: "first, one must consider 'whether the . . . action was justified at its inception'; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified interference in the first place.'" Id. at 341, 105 S. Ct. at 742-43 (citations omitted). The T.L.O. standard mirrors the standard announced in Terry v. Ohio governing the reasonableness of investigatory stops. See Terry v. Ohio,

12

392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968).

Under T.L.O's first prong, we examine whether Deputy Bostic has a reasonable basis for calling Gray over to him, i.e., stopping her, and asking her questions. It is undisputed that Deputy Bostic witnessed Gray threaten to do something physically to her teacher. Under Alabama Code § 13A-11-8, a verbal threat, "made with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her safety," constitutes the crime of harassment, which is a Class C misdemeanor. See Ala. Code § 13A-11-8(a)(1)-(3). Gray stresses neither Coach Williams nor Coach Horton feared for their safety and that Deputy Bostic had no probable cause or arguable probable cause to arrest her. However, under T.L.O., the level of suspicion in a school setting needed to justify a search or an investigatory stop is only reasonableness under the circumstances. Given his having witnessed Gray's threat in a school setting, Deputy Bostic's stopping Gray to question her about her conduct was reasonable.[7]

---

[7]Although defendants claim Deputy Bostic had probable cause, the conduct in § 13A-11-8 cases has been generally more egregious and has involved a credible threat. See, e.g., B.B. v. State, 863 So.2d 132, 135-36 (Ala. Crim. App. 2003) (holding that a disruptive seventh grade student who threatened to kill his teacher violated § 13A-11-8 where the student was very angry during the incident, uttered the threat through clenched teeth and threw a desk across the room while stating, "I hate that teacher, I hate that teacher," and the teacher and another witness both testified that they feared the student would harm the teacher); Fallin v. City of Huntsville, 865 So.2d 473, 477 (Ala. Crim. App. 2003) (concluding that defendant violated § 13A-11-8 where defendant, a large man, was yelling threats to his daughter's cheerleading coach while

13

Turning to T.L.O's second prong, we must consider whether Deputy Bostic's subsequent handcuffing of Gray "was reasonably related to the scope of the circumstances which justified the interference in the first place." Id. at 341, 105 S. Ct. at 743 (quotation marks omitted and emphasis supplied). "[A seizure] will be permissible in its scope when the measures adopted are reasonably related to the objectives of the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." T.L.O., 469 U.S. at 342, 105 S. Ct. at 743. After stopping Gray, Deputy Bostic not only questioned her, but also handcuffed her for not less than five minutes. Thus, the question under the second prong is whether the handcuffing of nine-year-old Gray was reasonably related to the scope of the circumstances which justified Deputy Bostic's initial interference and was not excessively intrusive.

By his own admission, Deputy Bostic did not handcuff Gray to effect an arrest of Gray. Rather, his handcuffing of Gray was during an investigatory stop. Nonetheless, during an investigatory stop, an officer can still handcuff a detainee when the officer reasonably believes that the detainee presents a potential threat to

approaching her with waiving arms and pointing fingers and the coach and other witnesses testified that they were afraid for their safety).

However, because T.L.O. does not require probable cause in a school setting, we need not reach the issue of whether Deputy Bostic had probable cause or arguable probable cause. See Durruthy v. Pastor, 351 F.3d 1080, 1089 (11th Cir. 2003) (explaining that a showing of only arguable probable cause is required to establish that an officer is entitled to qualified immunity).

14

safety.  See United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989);

United States v. Blackman, 66 F.3d 1572, 1576-77 (11th Cir. 1995); United States

v. Kapperman, 764 F.2d 786, 790-91 & n.4 (11th Cir. 1985).

The problem in this case for Deputy Bostic is that, at the time Deputy Bostic

handcuffed Gray, there was no indication of a potential threat to anyone's safety.

The incident was over, and Gray, after making the comment, had promptly

complied with her teachers' instructions, coming to the gym wall and then to

Coach Horton when told to do so.  There is no evidence that Gray was gesturing or

engaging in any further disruptive behavior.  Rather, Gray had cooperated with her

teachers and did not pose a threat to anyone's safety.  In fact, Coach Horton had

insisted that she would handle the matter, but Deputy Bostic still intervened.

Deputy Bostic does not even claim that he handcuffed Gray to protect his or

anyone's safety.  Rather, Deputy Bostic candidly admitted that he handcuffed Gray

to persuade her to get rid of her disrespectful attitude and to impress upon her the

serious nature of committing crimes.  In effect, Deputy Bostic's handcuffing of

Gray was his attempt to punish Gray in order to change her behavior in the future.

Thus, Deputy Bostic's handcuffing Gray was not reasonably related to the

scope of the circumstances that justified the initial investigatory stop.  Rather, the

handcuffing was excessively intrusive given Gray's young age and the fact that it

was not done to protect anyone's safety.  Therefore, the handcuffing of Gray violated Gray's Fourth Amendment rights.

**D.  Clearly Established Law**

Whether a constitutional right was "clearly established" at the time of the violation turns on "'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  Bashir, 445 F.3d at 1330 (quoting Saucier, 533 U.S. at 202, 121 S. Ct. at 2156).  We focus on the status of the law in March 2003 when Deputy Bostic detained and handcuffed Gray.

It is well settled that, under the Fourth Amendment, "[t]he scope of a detention must be carefully tailored to its underlying justification" and that the "investigatory methods employed [during a detention] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26 (1983).  As we have already discussed, this Court has long concluded that it is reasonable for officers to use handcuffs to protect themselves during an investigative detention.  See Hastamorir, 881 F.2d 1556-57; Kapperman, 764 F.2d at 790 n.4.  However, Gray does not cite and we cannot locate a case addressing before today when it may be reasonable to use handcuffs in an investigatory stop absent a safety rationale.  Thus, no factually similar pre-existing case law put

16

Deputy Bostic on notice that his use of handcuffs to discipline Gray was objectively unreasonable for Fourth Amendment purposes.

However, our inquiry does not end here. Even in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional when the constitutional violation is obvious, sometimes referred to as "obvious clarity" cases. See United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227 (1997) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] been previously held unlawful." (quotation marks omitted)); Vinyard v. Wilson, 311 F.3d 1340, 1350-51 (11th Cir. 2002).

The Fourth Amendment's general proscription against "unreasonable" seizures seldom puts officers on notice that certain conduct is unlawful under precise circumstances. Evans v. Stephens, 407 F.3d 1272, 1283 (11th Cir. 2005) (en banc). Nonetheless, on rare occasion we have concluded that general Fourth Amendment principles make the constitutional violation obvious. See, e.g., Evans, 407 F.3d at 1283 (concluding that the constitutional violation was obvious where an officer conducted body cavity searches in a degrading and forceful manner and when there was no need for immediate action); Vinyard, 311 F.3d at 1355

17

(concluding that the constitutional violation was obvious where the officer grabbed the arrestee by the hair and arm and applied pepper spray after she had been handcuffed and secured in the back of the patrol car); Lee v. Ferraro, 284 F.3d 1188, 1198-99 (11th Cir. 2002) (concluding that the constitutional violation was readily apparent where an officer slammed the arrestee's head against the trunk after she was handcuffed, secured and any risk of danger or flight had passed); Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000) (concluding that the constitutional violation was obvious where an officer permitted his dog to attack a handcuffed, compliant arrestee for two minutes and then threatened to kill the arrestee when he kicked the dog in an effort to resist the attack). In these cases, the officer's conduct at issue lay "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [him] notwithstanding the lack of [fact-specific] case law." Lee, 284 F.3d at 1199 (internal quotation marks omitted). Put another way, the officer's conduct in these cases was "well beyond the 'hazy border' that sometimes separates lawful conduct from unlawful conduct," such that every objectively reasonable officer would have known that the conduct was unlawful. Evans, 407 F.3d at 1283.

We likewise conclude that Deputy Bostic's conduct in handcuffing Gray, a compliant, nine-year-old girl for the sole purpose of punishing her was an obvious

violation of Gray's Fourth Amendment rights. After making the comment, Gray had complied with her teachers' and Deputy Bostic's instructions. Indeed, one of the teachers had informed Deputy Bostic that she would handle the matter. In addition, Deputy Bostic's purpose in handcuffing Gray was not to pursue an investigation to confirm or dispel his suspicions that Gray had committed a misdemeanor. Rather, Deputy Bostic's purpose in handcuffing Gray was simply to punish her and teach her a lesson. Every reasonable officer would have known that handcuffing a compliant nine-year-old child for purely punitive purposes is unreasonable. We emphasize that the Court is not saying that the use of handcuffs during an investigatory stop of a nine-year-old child is always unreasonable, but just unreasonable under the particular facts of this case.

Therefore, Deputy Bostic is not entitled to qualified immunity, and the district court properly denied summary judgment in his favor.

### E. Sheriff Sexton

Gray alleges that Sheriff Sexton failed to train and supervise adequately Deputy Bostic on the proper use of force in this elementary school setting. The district court dismissed Gray's official capacity claim against Sheriff Sexton without challenge. Thus, all that remains is her individual capacity claim against Sheriff Sexton as Deputy Bostic's supervisor.

19

Supervisory officials cannot be held liable under § 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability. Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999).[8] Instead, supervisors can be held personally liable when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation. Id. Gray does not allege that Sheriff Sexton personally participated in her handcuffed detention. Thus, Gray attempts to use the second method.

Under the second method, "[t]he causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." Id. (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)). Furthermore, to be sufficient to notify the supervisor, the deprivations must not only be widespread, they also "must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Id. (quoting Brown, 906 F.2d at 671).

There is no evidence in the record of widespread and obvious handcuffed detentions of students by Deputy Bostic or other deputy sheriffs. There was some

---

[8]For this reason, we reject Gray's argument that Sheriff Sexton can be held liable because, under Alabama law, a deputy sheriff is the agent and alter ego of the sheriff. To hold Sheriff Sexton liable for Deputy Bostic's alleged constitutional violation under an alter ego theory would amount to respondeat superior liability.

20

vague, arguably hearsay testimony by Coach Horton that she had heard that Deputy Bostic once placed another Holt Elementary student in handcuffs. However, there is no evidence that Sheriff Sexton was aware of this alleged incident. Furthermore, this one isolated incident, of which there are no details, is not sufficient to put Sheriff Sexton on notice that Deputy Bostic needed additional training or supervision on the use of force when detaining minors.

We also recognize that Gray alleges that Sheriff Sexton instituted a policy instructing deputies to detain, handcuff, arrest and incarcerate individuals who were not suspected of committing a crime. There is no evidence in the record, however, that Sheriff Sexton instituted such a policy or any other policy that would have led Deputy Bostic to believe that he could detain a student in handcuffs absent safety concerns.

Finally, Gray emphasizes that Deputy Bostic received no training specifically addressing the detention of students. She contends that Sheriff Sexton should have foreseen that unwarranted handcuffed detentions of students were "bound to happen" without such training. Thus, Gray is arguing that the need to train was "so obvious" that the failure to do so constituted deliberate indifference without prior notice. See Gold v. City of Miami, 151 F.3d 1346, 1352 (11th Cir. 1998) (addressing municipal liability for failure to train).

21

The Supreme Court has "hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Id. (quoting Bd. of County Comm'rs v. Brown, 520 U.S. 397, 409, 117 S. Ct. 1382, 1391 (1997). However, the Supreme Court's only example of an obvious training need was the use of deadly force when police officers are given firearms. We have already determined that the need for training regarding the proper use of handcuffs is "'[u]nlike the risk from a particular glaring omission in a training regimen,'" and is instead a risk from a "possible imperfection[], . . . in . . . training and supervision" that is "'not obvious in the abstract.'" Id. at 1352 (quoting in part Brown, 520 U.S. at 409, 117 S. Ct. at 1391).

We similarly conclude that the need for training regarding the detention of students specifically is not obvious in the abstract and that a lack of such training is a "possible imperfection," but not a "glaring omission" from a training regimen. Deputy Bostic received training, at both the police academy and the Tuscaloosa County Sheriff's Department, on the proper use of force and the principles of probable cause. The failure to provide specific training regarding the detention of students, in addition to general training regarding use of force during detention and

22

arrest, was not "so likely" to result in the violation of students' Fourth Amendment rights that Sheriff Sexton reasonably can be said to have been deliberately indifferent to the need for this particularized training without any prior notice. See City of Canton v. Harris, 489 U.S. 378, 390-92, 109 S. Ct. 1197, 1205-07 (1989) (finding no obvious need to train jail supervisors regarding when to provide medical treatment beyond first aid); Gold, 151 F.3d at 1352; Young v. City of Augusta, 59 F.3d 1160, 1172 (11th Cir. 1995) (finding no obvious need to train jailers regarding medical treatment for mental illnesses and dispensing of prescribed medication).[9] Accordingly, Sheriff Sexton was entitled to summary judgment in his individual capacity.

## F.    Injunctive Relief

Defendants also argue that the district court erred in failing to grant summary judgment on Gray's claim for injunctive relief against Sheriff Sexton.[10]

---

[9]Gray cites no case law or statute that required Sheriff Sexton to train SROs, such as Deputy Bostic, on how to detain students. Therefore, the law was not "clearly established" for purposes of qualified immunity such that a reasonable official in Sheriff Sexton's shoes would have known that the failure to provide such training constituted deliberate indifference. See Riley v. Newton, 94 F.3d 632, 637 (11th Cir. 1996) (concluding that sheriff was entitled to qualified immunity on failure-to-train claim where plaintiffs failed to cite case law or constitutional provision requiring sheriff to provide training on how to use Army personnel and rejecting plaintiffs' argument that City of Canton's general standard of liability in failure to train cases clearly established the right).

[10]Generally, the denial of summary judgment on a claim for injunctive relief is not a final appealable decision. Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc., 385 U.S. 23, 25, 87 S. Ct. 193, 195 (1966). However, "[u]nder the pendant appellate jurisdiction doctrine, we

Specifically, Gray's injunctive relief claim seeks a declaration that Sheriff Sexton's custom or policy of failing to train deputies on the detention of students is unconstitutional and seeks to enjoin Sheriff Sexton from continuing to implement that custom or policy. However, there is no evidence of an unconstitutional policy or custom implemented by Sheriff Sexton. Therefore, Gray's claim for injunctive relief against Sheriff Sexton also necessarily fails. Accordingly, Sheriff Sexton is entitled to summary judgment on Gray's claim for injunctive relief.

## IV. CONCLUSION

For the forgoing reasons, we affirm the district court's denial of summary judgment on Gray's illegal seizure claim against Deputy Bostic in his individual capacity, reverse the district court's denial of summary judgment on Gray's claims against Sheriff Sexton and on her separate excessive force claim against Deputy Bostic, and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART AND REMAND.**

---

may address [otherwise] nonappealable orders if they are 'inextricably intertwined' with an appealable decision." Hudson v. Hall, 231 F.3d 1289, 1294 (11th Cir. 2000) (quotation marks omitted). Here, Gray's claim for injunctive relief and Sheriff Sexton's argument that he is entitled to qualified immunity are inextricably intertwined because both turn on whether Sheriff Sexton has implemented an unconstitutional policy or custom. See Moniz v. City of Fort Lauderdale, 145 F.3d 1278, 1281 n.3 (11th Cir. 1998) (concluding that the issues are inextricably intertwined when the court, in resolving the qualified immunity issue, also reaches the merits of the pendant claim).