152 P.3d 1217

**In re JESSI W.**

**No. 1 CA–JV 05–0169.**

Court of Appeals of Arizona, Division 1, Department A.

Feb. 20, 2007.

Andrew P. Thomas, Maricopa County Attorney By Linda Van Brakel, Deputy County Attorney, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender By Ann M. Whitaker, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

EHRLICH, Judge.

¶ 1 Jessi W. was adjudicated delinquent for resisting arrest at his school by a uniformed Scottsdale Police Officer who was serving as a School Resource Officer ("SRO"). He appealed, complaining of insufficient evidence. The disposition of his appeal necessitates a consideration of the duality of the responsibilities of a uniformed police officer who, as an SRO, serves not only in a law-enforcement capacity but as a student counselor. For the reasons discussed below, we affirm the adjudication of delinquency.

### FACTS AND PROCEEDINGS

¶ 2 Scottsdale Police Department Officer Wayne Crenshaw was assigned to work as an SRO at Sierra Vista Academy ("the Academy"). His SRO responsibilities included that he "handle any crimes on campus," and, in this capacity, he had the same authority as any other Scottsdale Police officer to make an arrest. Beyond this duty, however, as an SRO, Crenshaw also was charged with being, in his own words, "a teacher and a counselor."

¶ 3 On April 14, 2005, Crenshaw was at the Academy wearing a police uniform and a badge identifying him as a member of the Scottsdale Police Department. At approximately 2:40 p.m., he was called to assist an Academy teacher who had seen Jessi and another Academy student running out of an abandoned building that had a "No Trespassing" sign posted on it.

¶ 4 Crenshaw saw Jessi walking on a sidewalk toward the school, and he called him to come talk in the office. When Jessi responded that he had "seen his ride," Crenshaw again asked Jessi to "just come in the office and talk to me." Although Jessi entered the Academy's main office, he first hesitated, directing profanity at Crenshaw, and then refused to continue following Crenshaw to Crenshaw's office, repeating that he wanted to go back outside to look for his ride. At this point, Crenshaw put his right hand on Jessi's left arm "to keep [Jessi] going the right direction [toward Crenshaw's office] without stopping." Jessi, however, pulled

away, saying "[d]on't touch me," whereupon Crenshaw again took Jessi's arm, and Jessi again pulled away, telling Crenshaw with profanity to "[g]et your hands off me." Crenshaw then placed Jessi in an "arm-bar escort," holding Jessi by the wrist and triceps as he attempted to direct Jessi toward his office. Jessi "continued to yell and try to twist and pull away," so Crenshaw tried to get Jessi off balance by applying pressure to Jessi's triceps so that Jessi would bend over at the waist. As Crenshaw did so, Jessi made a fist with his right hand and attempted to swing at Crenshaw. Crenshaw then got Jessi on the ground and told him "[r]oll over. You're under arrest." Jessi refused to give Crenshaw his hands, but Crenshaw succeeded in handcuffing him.

¶ 5 The State filed a two-count delinquency petition accusing Jessi of criminal trespass and resisting arrest. The trespass charge later was dismissed without prejudice.

¶ 6 At the adjudication hearing, Crenshaw testified that, although it was his intention to arrest Jessi once Jessi was inside Crenshaw's private office, he had no intention of arresting Jessi outside the school or in the main office because "[t]he school doesn't like me arresting kids in front of everybody else, in front of the whole staff members. No one wants to know what's going on. The principal doesn't want me to make a scene in front of everybody."

¶ 7 Mario Dominguez, a "security specialist" assigned to work at the Academy, had witnessed the interaction between Jessi and Crenshaw. He testified and substantially corroborated Crenshaw's testimony.

¶ 8 At the close of the State's evidence, Jessi's counsel moved for a judgment of acquittal, arguing that there was insufficient evidence of Jessi's intent to resist arrest because Jessi had had no reason to know that he was being placed under arrest until Crenshaw so declared. The juvenile court denied the motion.

¶ 9 Jessi then presented his defense, calling Nancy Hudson, the principal of the Acad-

emy, as a witness. Hudson stated that she had also seen the incident between Jessi and Crenshaw and that, although Jessi was being "mouthy," she did not see him try to strike Crenshaw. She also testified that, after Crenshaw had pushed Jessi to the ground, Jessi had somehow expressed that his arm was hurting and agreed to cooperate with Crenshaw.

¶ 10 Following Hudson's testimony, Jessi's counsel renewed his motion for judgment of acquittal, which the juvenile court again denied. The court adjudicated Jessi delinquent for resisting arrest, and it continued him on standard probation.[1]

### DISCUSSION

¶ 11 In reviewing the juvenile court's adjudication of delinquency, we review the evidence and resolve all reasonable inferences in the light most favorable to upholding its judgment. *In re William G.*, 192 Ariz. 208, 212, 963 P.2d 287, 291 (App.1997). We determine *de novo*, however, whether the evidence before the court "existed in sufficient quantity so that any rational trier of fact" could find beyond a reasonable doubt that the juvenile had committed the offense. *Id.*

¶ 12 The elements of the offense of resisting arrest are set forth in Arizona Revised Statutes ("A.R.S.") section 13–2508(A) (2001):

A person commits resisting arrest by intentionally preventing or attempting to prevent a person reasonably known to him to be a peace officer, acting under color of such peace officer's official authority, from effecting an arrest by:

1. Using or threatening to use physical force against the peace officer or another; or

2. Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

The statute prescribes a culpable mental state of intent without distinguishing among the elements of the offense, so each element

---

1. Jessi was on standard probation as a result of having pled delinquent to a charge of reckless driving.

of the offense must be committed intentionally. *See* A.R.S. § 13–202(A) (2001).

¶ 13 The juvenile court asked both parties to discuss *State v. Womack*, 174 Ariz. 108, 847 P.2d 609 (App.1992), "regarding communication by officer of intent to arrest the juvenile." The court in *Womack*, however, expressly declined to address the issue with which we are presently concerned, which is the element of the intent for the offense of resisting arrest: Did Jessi intentionally attempt to prevent a person reasonably known to him to be a peace officer, acting under color of the officer's authority, from effecting an arrest? This issue is entwined in two phrases of the statute: "reasonably known to him to be a peace officer" and "acting under color of such peace officer's official authority."

¶ 14 Whether a person is reasonably known to another to be a peace officer turns strongly on the facts of each case. When Crenshaw was at school, he wore a Scottsdale Police Department uniform and badge. This could leave but one impression as to Crenshaw's role in the mind of the observer. Jessi must have reasonably known Crenshaw to be a peace officer.

¶ 15 Construing the second phrase is not so certain, however, because it is unclear whether the peace officer simply must be acting under color of official authority or whether the person being arrested also must reasonably know that the officer is doing so. In interpreting a statute, we first look to its plain language as the best indication of its meaning. *State v. Mitchell*, 204 Ariz. 216, 218 ¶ 12, 62 P.3d 616, 618 (App.2003).

¶ 16 The phrase "acting under color of such peace officer's official authority" is set off from the remainder of the statute with commas, indicating that it is a non-restrictive clause or one that is not essential for the meaning of the sentence. To arrest someone, a peace officer must necessarily be acting under official authority to lawfully effect the act. Such an understanding of the officer's authority would allow the phrase to be removed without changing the sentence's essential meaning. This reading is consistent with the grammatical structure of the statute. Had the legislature intended to graft a requirement that the person being arrested reasonably know that the peace officer was acting under color of official authority, it would have written the statute without the use of a non-restrictive clause. The phrase "acting under color of such peace officer's official authority" is an elemental clause modifying "peace officer" and not qualified by the phrase "reasonably known."

¶ 17 Neither party has presented case law discussing when or in what manner an SRO acts under color of a peace officer's official authority, nor has our research revealed any. In deciding whether privately employed, off-duty officers were acting under official authority, Arizona courts have looked to whether the officer was acting in "vindication of public right and justice" or simply performing acts required by the employer. *State v. Kurtz*, 78 Ariz. 215, 218, 278 P.2d 406, 408 (1954); *State v. Fontes*, 195 Ariz. 229, 231 ¶ 8, 986 P.2d 897, 899 (App.1998).

¶ 18 In *Kurtz*, several uniformed Phoenix police officers were employed by the operator of the Riverside Ballroom "to preserve order and protect his property while dances were in progress on the premises." 78 Ariz. at 216, 278 P.2d at 407. One night, the officers' attention turned from the ballroom to a disturbance outside where two girls were being arrested by on-duty officers. *Id.* The girls were being placed in a squad car, and, from out of the crowd that had gathered, Walter Kurtz stuck his head inside the car and shouted abusive language. *Id.* One of the off-duty officers arrested Kurtz, but William Gorman jumped on the officer's back, pulled him to the ground, and kicked and hit him. *Id.* at 216–17, 278 P.2d at 407. Kurtz broke loose, hit another off-duty officer in the head and kneed him in the leg, bringing the officer to the ground. *Id.* at 217, 278 P.2d at 407. Kurtz and Gorman were subdued, and subsequently charged and convicted for resisting arrest. *Id.* On appeal, they contended that the off-duty officers "were not at that time 'public officers' discharging or attempting to discharge the duties of their office, but were stripped of their official character and capacity and relegated to the status of being servants of the proprietor by whom they were employed...." *Id.*

¶ 19 The Arizona Supreme Court applied the vindication test to determine whether the off-duty officers were acting under official authority or in furtherance of their private employment. *Id.* at 218, 278 P.2d at 408. The court considered that the ballroom operator could not and did not control the officers, that the officers had to respond to any emergency calls, that the officers had obtained written authorization from the police chief to accept the off-duty employment, that the officers were in uniform and that the police manual stated that officers were responsible for "taking proper police action on any matter coming to their attention at any time." *Id.* at 218–19, 278 P.2d at 408. The court held that it was clear that the officers were vindicating the public right. *Id.* at 219, 278 P.2d at 408.

¶ 20 In *Fontes,* an off-duty sheriff's deputy employed as a plainclothes security officer by a supermarket witnessed a theft by Steven Soto Fontes. 195 Ariz. at 230 ¶ 2, 986 P.2d at 898. With the store manager, the officer approached Fontes, showed him his sheriff's badge, identified himself as a deputy sheriff and told Fontes that he was under arrest. *Id.* The officer advised Fontes to cooperate and not to fight but to turn around so that he could be handcuffed. *Id.* Instead, Fontes ran out the door, where he was caught by the officer, who again informed Fontes that he was under arrest. *Id.* at ¶ 3. In being subdued, Fontes cursed, threatened and hit the officer in the face. *Id.* He was eventually handcuffed and still continued to curse and threaten the officer. *Id.*

¶ 21 Convicted of resisting arrest, Fontes appealed. He argued that the officer was not "engaged in the execution of any official duties" or "acting under color of (the) officer's official authority." *Id.* at 231 ¶ 5, 986 P.2d at 899. This court in affirming the conviction held that a sheriff's duty to preserve the peace applies even when the officer is not on duty. *Id.* at ¶ 8. The court noted that the deputy saw the crime take place, identified himself, showed official identification, followed official procedures and "attempted to execute his statutory duties by arresting [Fontes]." *Id.* at 232 ¶ 8, 986 P.2d at 900.

¶ 22 The United States Court of Appeals for the Eleventh Circuit has addressed the role of a law-enforcement officer acting in the capacity of an SRO in the context of a civil-rights proceeding. *Gray ex rel. Alexander v. Bostic,* 458 F.3d 1295 (11th Cir.2006). Gray, a student in a physical-education class, when asked to come aside to speak with the teacher, threatened to hit the teacher. *Id.* at 1300. Another teacher heard the threat and called Gray over. *Id.* at 1301. Deputy Antonio Bostic, an SRO, intervened and escorted Gray out of the gym. *Id.* Bostic told Gray to turn around, and then pulled Gray's hands behind her back and handcuffed her, telling Gray that "(T)his is how it feels when you break the law," and "(T)his is how it feels to be in jail." *Id.* Gray cried, stood with the handcuffs on for less than five minutes and then waited in the coaches' office until the next class. *Id.* at 1301–02.

¶ 23 Gray sued Bostic for Constitutional violations pursuant to 42 United States Code section 1983. *Id.* at 1302. Her case eventually was heard in the court of appeals, where she argued that "Bostic was not acting within the scope of his discretionary authority when he detained and handcuffed Gray." *Id.* at 1303. The court held that an action is within the scope of discretionary authority when it is undertaken pursuant to the performance of an officer's duties and within the scope of his authority. *Id.* It decided that Bostic's actions were within his discretionary responsibilities, relying on the fact that an SRO is "charged with the responsibility to investigate criminal activity that might be taking place at [the school]" and may detain, question and arrest or handcuff students under the appropriate circumstances. *Id.* at 1303–04. The court affirmatively declined to consider whether those circumstances were present, labeling them as irrelevant to the issue whether the SRO's actions, if proper, were within his official duties. Id. at 1303–04.

¶ 24 Crenshaw was a uniformed police officer charged with the performance of his law-enforcement duties who had been called to assist in the investigation of an alleged crime. Although, as an SRO, Crenshaw was also a "teacher and a counselor," Crenshaw re-

mained obligated by his official role to investigate the reported crime, similar to what was necessary for the off-duty officers in *Kurtz* and *Fontes* and for the SRO in *Gray*. Jessi does not maintain that Crenshaw's identity as an officer was unknown to him. Regardless of the moment when Crenshaw formed his intent to arrest Jessi before they reached Crenshaw's office, Jessi engaged in increasingly belligerent behavior, prompting Crenshaw to respond with commensurate force to restrain Jessi prefatory to Crenshaw's declaration that Jessi was under arrest. Clearly by the time that Jessi tried to hit Crenshaw, Crenshaw was trying to effect and Jessi was trying to resist arrest. The evidence is sufficient to uphold the juvenile court's adjudication.

## CONCLUSION

¶ 25 For the foregoing reasons, we affirm the juvenile court's adjudication and disposition.

CONCURRING: JON W. THOMPSON and MICHAEL J. BROWN, Judges.