# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2058

_____

| | | |
|---|---|---|
| Karim G. El-Ghazzawy, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Kay Berthiaume, acting in her | * | Appeal from the United States |
| individual capacity as an officer | * | District Court for the |
| of the Bloomington Police Department, | * | District of Minnesota. |
| | * | |
| Defendant - Appellant, | * | |
| | * | |
| Michael David Wisniewski, and | * | |
| Pawn America, Minnesota, L.L.C., | * | |
| a Minnesota limited liability company, | * | |
| | * | |
| Defendants. | * | |

_____

Submitted: December 15, 2010
Filed: March 15, 2011

_____

Before LOKEN, ARNOLD, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

Karim El-Ghazzawy brought suit against Officer Kay Berthiaume under 42 U.S.C. § 1983 for violating his constitutional rights after Berthiaume arrested El-Ghazzawy due to his alleged sale of counterfeit watches to a pawn shop. The

district court[1] denied Berthiaume's motion for summary judgment, concluding she was not entitled to qualified immunity. Berthiaume contends the court erred because it was reasonable for her to place El-Ghazzawy in handcuffs for an investigatory detention. We affirm.

I

Karim El-Ghazzawy is a lawyer licensed to practice law in Minnesota. As a hobby, he collects and sells high-end wrist watches. The instant action arose after El-Ghazzawy was arrested for allegedly selling counterfeit watches at Pawn America in Bloomington, Minnesota.

On October 29, 2008, El-Ghazzawy brought five or six watches to Pawn America and met with Robert Schmidt, an employee who had the authority to make purchasing decisions on items from prospective sellers. Schmidt evaluated the watches and determined their approximate value. Schmidt also reviewed El-Ghazzawy's driver's license and learned El-Ghazzawy was a lawyer. At the end of the meeting, El-Ghazzawy sold two watches, a Corum and an Ebel, for $1,200.

The following day, El-Ghazzawy returned with a few more watches and spoke with the store manager, Jon Garner. Garner "qualified" El-Ghazzawy as a seller after learning he was both a lawyer and a long-time watch collector. After examining El-Ghazzawy's watches closely and receiving authority from District Manager Michael David Wisniewski, Garner purchased a women's 18-carat yellow gold Baume & Mercier for $1,500 and a men's stainless steel Breitling for $1,200.

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

On November 11, 2008, El-Ghazzawy again returned seeking to sell five additional watches – a Corum Trapeze, a Corum, a Baume & Mercier, a Chaumet, and an Ebel. Wisniewski examined the watches and asked El-Ghazzawy how much he paid for the watches, but El-Ghazzawy refused to provide that information. Wisniewski then inspected the Breitling sold two weeks earlier, and after conducting website research and a visual review of the watch, he determined it was a fake based on the tilted symbol, the blurry numbers, the undetailed dial, and the watch's weight. Surveillance footage of the incident revealed Wisniewski's inspection lasted, at most, one minute and eight seconds. As a result of his determination, Wisniewski called the Bloomington Police Department. Shortly thereafter, Officer Kay Berthiaume responded to the following dispatch:

> I'll put you in the area of Pawn America, 8650 Lyndale. They have a male there that's ah . . . employee called in. They have a male that's returned. He . . . in the past, sold counterfeit watches. Apparently he's trying to do it again. Mixed race male, wearing the suit.

Berthiaume testified she responded to a possible theft by swindle, which was a felony.

Less than two minutes after the dispatch, Berthiaume entered Pawn America, approached El-Ghazzawy, and told him he was going to be detained. Berthiaume immediately placed El-Ghazzawy in handcuffs, without making any investigation, which she testified was due to her safety and the safety of those around the store. Berthiaume then conducted a weapons search and ran El-Ghazzawy's driver's license to check for any outstanding warrants. About four minutes after the handcuffing, Bloomington Police Officer Larry Mena arrived at the store so as to provide additional assistance.

While Mena monitored El-Ghazzawy, Berthiaume proceeded to the back room to meet with Wisniewski. Wisniewski indicated El-Ghazzawy's watches were counterfeit based on the Breitling he inspected earlier. Berthiaume also looked at the

-3-

Breitling, and Wisniewski informed her the store had suffered a loss of $3,900. Because Berthiaume had no independent experience upon which to draw her own opinion as to the legitimacy of the watches, she relied on Wisniewski's expertise as District Manager of the store.

Berthiaume then questioned El-Ghazzawy about the transactions. He denied selling fake watches, and he indicated he was a lawyer and he had receipts for the watches at his office. He also stated he purchased all of the watches at the ShopNBC store in Eden Prairie, Minnesota, except for the Breitling, which was purchased from the Tourneau store in Las Vegas, Nevada. Based on all the above information, El-Ghazzawy was arrested for theft by swindle and transported to the Bloomington Police Department, where he was fingerprinted and booked. Because it was Veterans Day, there were no investigators on duty, and El-Ghazzawy was required to stay overnight in the jail. He estimated he was held for twenty-three hours.

The next day, El-Ghazzawy met with Detective Douglas Barland. El-Ghazzawy's wife brought the watch receipts to Barland, and El-Ghazzawy was released shortly thereafter pending further investigation. Barland went to Pawn America to retrieve the watches sold by El-Ghazzawy, and during his visit, Garner informed Barland the watches were authentic based on Garner's prior investigation. Barland subsequently brought the watches to a local expert, who determined each watch was authentic. Finally, Barland spoke with employees at ShopNBC to obtain more information about El-Ghazzawy's purchases. After Barland concluded his investigation, no charges were brought against El-Ghazzawy.

In February 2009, El-Ghazzawy brought suit against Berthiaume in her individual capacity for depriving him of his constitutional right to be free from unreasonable searches and seizures under the Fourth Amendment when she placed him under arrest. His complaint also included allegations of defamation per se and false imprisonment against Pawn America and Wisniewski. All three defendants filed

motions for summary judgment to dismiss El-Ghazzawy's claims. The district court denied Berthiaume's motion, but granted the motions from Pawn America and Wisniewski by dismissing the false imprisonment claim and denying the motion in part with regard to the defamation per se claim. El-Ghazzawy later settled his remaining claims against Pawn America and Wisniewski. Berthiaume now appeals the court's denial of her motion for summary judgment based on qualified immunity.

II

We review the district court's denial of summary judgment based on qualified immunity de novo and view the evidence in the light most favorable to the nonmoving party. Morris v. Zefferi, 601 F.3d 805, 808 (8th Cir. 2010) (citation omitted). While we ordinarily lack jurisdiction to hear an immediate appeal of a denial of summary judgment, an interlocutory appeal denying qualified immunity is appealable "to the extent that it turns on an issue of law." Aaron v. Shelley, 624 F.3d 882, 883 (8th Cir. 2010) (internal quotation marks and citation omitted).

"Qualified immunity shields a public official . . . from civil lawsuits when her conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Doe v. Flaherty, 623 F.3d 577, 583 (8th Cir. 2010) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In analyzing qualified immunity, we ascertain (1) whether the facts alleged, construed in the light most favorable to the nonmoving party, establish a violation of a constitutional right, and (2) whether such right was clearly established so that a reasonable officer would have known her actions were unlawful. Id. We retain discretion to decide which of these prongs to analyze first. Dodd v. Jones, 623 F.3d 563, 566-67 (8th Cir. 2010) (citing Pearson v. Callahan, 129 S.Ct. 808, 818 (2009)). "Denial of qualified immunity will be affirmed if a genuine issue of material fact exists as to whether a reasonable officer could have believed his actions to be lawful." Nance v. Sammis, 586 F.3d 604, 609 (8th Cir. 2009) (internal quotation marks and citation omitted).

A. Whether a Constitutional Violation Occurred

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Under Terry v. Ohio, 392 U.S. 1 (1968), "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). "A Terry stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." United States v. Johnson, 592 F.3d 442, 451 (3d Cir. 2010). Accordingly, the Supreme Court in Terry created a dual inquiry whereby we examine (1) whether the investigatory stop is lawful at the outset, and (2) whether the manner in which the stop was conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20.

It is the second prong to which we focus our analysis in the instant matter. The Supreme Court has long recognized an officer's right to conduct an investigatory stop inherently includes the right to use some degree of physical force or threat to effect the stop. Graham v. Connor, 490 U.S. 386, 396 (1989). "The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances." Muehler v. Mena, 544 U.S. 93, 103 (2005) (Kennedy, J., concurring) (citing Graham, 490 U.S. at 397). With this in mind, we have previously held officers may use handcuffs as a reasonable precaution to protect the officers' safety and maintain the status quo during the Terry stop. United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006). "However, the use of handcuffs is greater than a de minimus intrusion and thus requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." Lundstrom v. Romero, 616 F.3d 1108, 1122 (10th Cir. 2010) (internal quotation marks and citation omitted).

In other words, to conduct a protective frisk under <u>Terry</u>, officers must have specific articulable facts, which, along with rational inferences, support a reasonable suspicion a suspect is potentially armed and dangerous. <u>United States v. Binion</u>, 570 F.3d 1034, 1039 (8th Cir. 2009). "[L]ikewise, for the use of handcuffs during a <u>Terry</u> stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." <u>Bennett v. City of Eastpointe</u>, 410 F.3d 810, 836 (6th Cir. 2005).

Applying these principles to the instant matter, we conclude on this record that Berthiaume's handcuffing and frisk of El-Ghazzawy violated his Fourth Amendment rights. First, there was nothing in the dispatch to indicate El-Ghazzawy could be armed or dangerous. <u>See</u> <u>Washington v. Lambert</u>, 98 F.3d 1181, 1189-90 (9th Cir. 1996) (considering the specificity of the information received by the officers in determining whether the officers' response was reasonable). Second, the crime El-Ghazzawy was suspected of committing, theft by swindle, was not a dangerous crime which would cause concern of him being armed and dangerous. <u>Compare with</u> <u>United States v. Johnson</u>, 528 F.3d 575, 580 (8th Cir. 2008) ("In light of the dangerousness of the suspected drug trafficking, and the likelihood that [the defendant] had access to a weapon, it was reasonable for the police to restrain [the defendant's] hands."); <u>United States v. Navarrete-Barron</u>, 192 F.3d 786, 791 (8th Cir. 1999) (holding the use of handcuffs were reasonably necessary to protect the officers and maintain the status quo in light of the nature of the suspected crime of drug trafficking and the good possibility the suspects had a weapon).

Third, El-Ghazzawy exhibited no erratic or suspicious behavior prior to or during Berthiaume's arrival at the scene. To the contrary, El-Ghazzawy was, by all accounts, calm and cooperative during the entirety of the incident. <u>Compare</u> <u>Shannon v. Koehler</u>, 616 F.3d 855, 863 (8th Cir. 2010) ("Assuming, then, that [the plaintiff's] story is true – *i.e.*, assuming he was not threatening anyone, not resisting arrest, and

so on – it was not reasonable for [the officer] to use more than de minimus force against him.") and Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1306 (11th Cir. 2006) (concluding the officer's handcuffing of the suspect was not reasonably related to the circumstances justifying the initial stop where there was no threat to anyone's safety and the suspect was complying with instructions and not engaging in disruptive behavior), with United States v. Gilliam, 520 F.3d 844, 847-48 (8th Cir. 2008) (relying on the fact the suspect was avoiding contact with the police and ignoring commands to stop to conclude there was a reasonable concern for officer safety).

Fourth, Berthiaume failed to conduct even the most basic investigation into the facts prior to handcuffing and frisking El-Ghazzawy, which occurred less than a minute after she entered the store. In a case involving similar circumstances, the Tenth Circuit concluded the officers' handcuffing of a suspect violated the Fourth Amendment because (1) the officers did not interview the suspect, and (2) the suspect did not act in a threatening manner or refuse to cooperate with police, and therefore, there were no concerns for the officers' safety. Lundstrom, 616 F.3d at 1123. Likewise, in this case, Berthiaume failed to pose a single question to El-Ghazzawy or store personnel to ascertain the basis of the dispatch. Instead, Berthiaume handcuffed and detained El-Ghazzawy within mere seconds of entering Pawn America, despite conducting no investigation into the facts. See id. ("Rather than undertake the most rudimentary investigation–asking [the suspect] what happened–the officers handcuffed her . . . .").

Finally, we note Berthiaume had plenty of opportunity to make the stop in a less threatening manner because there were no exigent circumstances and the allegedly counterfeit watches sold by El-Ghazzawy were already in the custody of Pawn America personnel. See United States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010) ("Officers must use the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the Terry stop.") (internal quotation marks and citation omitted). Although Berthiaume

was the only officer to respond to the scene initially, this fact, standing alone, does not permit the intrusive conduct of handcuffing and frisking a cooperative individual suspected of a non-dangerous offense. Indeed, nowhere in our case law is it suggested that a sole responding officer retains the ability to handcuff and frisk suspects absent any objective safety concern. Moreover, as the district court recognized, even after backup arrived a few minutes later, Berthiaume did not remove the handcuffs as she began her investigation.

In sum, Berthiaume fails to point to specific facts supporting her concern for officer safety. See United States v. Mohamed, 630 F.3d 1, 6-7 (1st Cir. 2010) ("When challenged, the government must be able to point to some specific fact or circumstance that could have supported a reasonable belief that the use of [handcuffs] was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.") (internal quotation marks and citation omitted). By Berthiaume's logic, officers would be allowed to handcuff, frisk, and detain virtually every suspect they encounter, without regard to the nature of the crime, the behavior exhibited by the suspect, or the circumstances surrounding the alleged crime, under the pretext of officer safety. Terry does not permit such intrusive measures in the absence of any objective safety concerns. Washington v. Lambert, 98 F.3d 1181, 1187 (9th Cir. 1996) ("The police may not employ such tactics [including handcuffing] *every time* they have an 'articulable basis' for thinking that someone may be a suspect in a crime.") (emphasis in original); Bowden v. Town of Speedway, Ind., 539 F. Supp. 2d 1092, 1101 (S.D. Ind. 2008) (concluding the handcuffing of an unarmed, non-violent person violated the Fourth Amendment because it exceeded the bounds of Terry).

Viewing the circumstances in the light most favorable to El-Ghazzawy, Berthiaume's conduct was not reasonably necessary to protect her personal safety and to maintain the status quo during the investigatory stop. We therefore conclude her handcuffing and frisking of El-Ghazzawy was not "reasonably related in scope to the

circumstances which justified the [stop] in the first place," Terry, 392 U.S. at 19-20, and Berthiaume violated El-Ghazzawy's Fourth Amendment right to be free from unreasonable searches and seizures.[2]

B.  Whether the Constitutional Right Was Clearly Established

Next, the parties dispute whether the constitutional right was clearly established, which is "a legal question for the court to decide." Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009) (citation omitted). "This second step is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition." Seymour v. City of Des Moines, 519 F.3d 790, 798 (8th Cir. 2008) (internal quotation marks and citation omitted). "In determining whether a right is clearly established, we ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Frye v. Kansas City Mo. Police Dep't., 375 F.3d 785, 789 (8th Cir. 2004) (internal quotation marks and citation omitted). To this end, we must examine whether prior case law provided "fair warning" the officer's conduct was unconstitutional. Hope v. Pelzer, 536 U.S. 730, 740-41 (2002).

"It is well settled that, under the Fourth Amendment, '[t]he scope of a detention must be carefully tailored to its underlying justification' and that the 'investigatory methods employed [during a detention] should be the least intrusive means reasonably

---

[2]We decline to reach the issue of whether a de facto arrest occurred when Berthiaume handcuffed El-Ghazzawy because the unreasonable application of Terry alone establishes the requisite constitutional violation for qualified immunity purposes. See Johnson, 592 F.3d at 451-52 ("[The defendant] devotes most of his brief to arguing that the officers' conduct subjected him to a *de facto* arrest . . . However, an excessively intrusive Terry stop is not unconstitutional because its overly broad scope necessarily places a suspect under *de facto* arrest . . . [but] because its scope is generally unreasonable under all of the circumstances.") (internal citation omitted).

-10-

available to verify or dispel the officer's suspicion in a short period of time.'" Bostic, 458 F.3d at 1306 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). Nevertheless, we have acknowledged there is no litmus test to determine when an officer's conduct exceeds the confines of Terry. United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004). "It is well established, however, that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." Id. It follows that the converse is equally true: it is well established that if suspects are cooperative and officers have no objective concerns for safety, the officers may not use intrusive tactics such as handcuffing absent any extraordinary circumstances. Lambert, 98 F.3d at 1192. Stated differently:

> Counsel may shout "officer safety" until blue-in-the-face, but the Fourth Amendment does not tolerate, nor has the Supreme Court or this Court ever condoned, pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that the person detained was armed and dangerous. The Supreme Court has, in interpreting the Fourth Amendment, struck a balance between the justifiable concern for officer safety when confronting an individual and the substantial individual interest in being free from unreasonable intrusion. The Framers' concerns and clear intent to protect individuals from arbitrary government intrusion was enshrined in the Fourth Amendment to prevent situations such as those alleged here – officers, having no reason to fear for their safety, may not require citizens, whom they have not arrested, to stand up against gates or place their hands on police cars, and submit to searches. This has long been the law.

Bennett, 410 F.3d at 841.

In the instant matter, El-Ghazzawy relies on a report by an expert in police practices and law enforcement that articulates the series of professionally unreasonable actions conducted by Berthiaume. For instance, in conjunction with the

-11-

above case law, the expert states, "[i]n cases where officers handcuff a person for officer safety the officer must be able to articulate facts and circumstances that would lead a reasonable officer to believe that there is a reasonable safety concern." App'ee App'x 306. The expert goes on to conclude there was no such articulable safety threat in this case, and thus "the stop should have been conducted without handcuffing while the preliminary investigation took place." Id. Moreover, the expert points to Berthiaume's failure to evaluate all of the information, including exculpatory information, within her grasp during the stop. Id. at 313.

We agree. Accordingly, we conclude a reasonable officer could not have believed it was lawful to handcuff and frisk a suspect absent any concern for safety. See Manzanares v. Higdon, 575 F.3d 1135, 1150 (10th Cir. 2009) ("[A]ny reasonable officer would understand that it is unconstitutional to handcuff someone absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion."). Because the prior case law provided fair warning to Berthiaume at the time of the incident, we conclude Berthiaume violated El-Ghazzawy's clearly established Fourth Amendment right to be free from unreasonable searches and seizures. As a result, the district court properly denied qualified immunity to Berthiaume.[3]

---

[3]Berthiaume suggests her investigation subsequent to the initial detention, at a minimum, limits El-Ghazzawy's damages to the brief time between the constitutional violation and the investigation. However, any issues regarding damages are not before us at this time because the sole issue on appeal concerns qualified immunity. See Krout v. Goemmer, 583 F.3d 557, 564-65 (8th Cir. 2009) (noting we have no jurisdiction to review issues of causation or damages in an interlocutory appeal of a denial of summary judgment based on qualified immunity).

## III

For the foregoing reasons, we affirm the district court's denial of Berthiaume's summary judgment motion based on qualified immunity.

_____