[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-11819

_____

D.C. Docket No. 7:03-cv-02989-UWC

LAQUARIUS GRAY, a minor, by and through her mother and next friend, Toniko
L. Alexander,

Plaintiff-Appellee,

versus

ANTONIO BOSTIC,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(July 3, 2013)

Before WILSON and COX, Circuit Judges, and BOWEN,* District Judge.

BOWEN, District Judge:

_____

* Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District
of Georgia, sitting by designation.

This is the fifth appeal involving the detention and handcuffing of a nine-year-old student, Laquarius Gray,[1] during her physical education class. Now, Antonio Bostic, a Deputy Sheriff for Tuscaloosa County, Alabama, appeals from the district court's grant of attorney's fees. After careful review and oral argument, we reverse and remand for the entry of judgment in favor of Defendant Antonio Bostic.

## I. BACKGROUND

### A. Factual Background

At this point in the case, the factual background is undisputed. Gray was a nine-year old female African-American student at Holt Elementary School in Tuscaloosa, Alabama, at the time of the incident. Bostic was a Deputy Sheriff for Tuscaloosa County, in Alabama.

On March 7, 2003, while attending her physical education class, Gray had a disagreement with her instructor as to whether she properly completed the "jumping jack" exercises she was ordered to perform. Gray ex rel. Alexander v.

---

[1] Laquarius Gray was a minor when the litigation commenced. Thus, any reference to Gray is intended to reflect and include the fact that this action was brought on her behalf by and through her mother and next friend, Toniko L. Alexander.

Bostic, 458 F.3d 1295, 1300 (11th Cir. 2006) ("Gray II").  Gray's instructor ordered her to sit against the wall behind the class.  Id.  During the course of the disagreement, Gray made a disrespectful and physically threatening comment to the instructor.  Id.  At that time, Bostic was stationed as a school resource officer, and he was present when Gray made the threatening remarks to her instructor.  Id. at 1301.  Despite another female teacher being present and offering to handle the situation, Bostic immediately intervened and ordered Gray to exit the gymnasium. Bostic then took Gray into an adjacent lobby area, where he pulled her arms behind her back and handcuffed her.  Id.  "Bostic testified that Gray was handcuffed for less than 60 seconds."[2]  (Appellant Br. 5.)  Simply put, Bostic applied the handcuffs to an arguably compliant nine-year-old child for purely punitive purposes.

**B. Procedural Background**

*1. Initial District Court Proceedings*

Gray brought suit against Bostic and Tuscaloosa County Sheriff Edmund Sexton in their official and individual capacities on November 4, 2003.  Nine other defendants were also named in the complaint in both their individual and official

---

[2] On appeal, Appellee-Plaintiff Laquarius Gray adopts Appellant-Defendant Antonio Bostic's version of the facts.  (Appellee Br. viii.)

capacities: Joyce Harris, the Principal of Holt Elementary School; Joyce Sellers, the Superintendent of Tuscaloosa County, Alabama; and Frankie Thomas, James Barnnet, James Junkin, Morris Acker, Don Presley, Dot Smith, and Pam Garner, all Board Members of the Tuscaloosa County Board of Education. Gray's initial complaint against these eleven defendants listed eight counts, including claims: (1) under 42 U.S.C. § 1983 for violations of Gray's First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights (Count 1); (2) under 42 U.S.C. § 1981 (Count 2); and (3) under state law for invasion of privacy, assault and battery, false imprisonment, defamation, and intentional infliction of emotional distress (Counts 4 through 8). Gray also requested declaratory and injunctive relief (Count 3). As to each count, Gray sought an unspecified amount of compensatory and punitive damages; attorney's fees, expenses, and costs of litigation; and any other equitable relief to which she may have been entitled.

Defendants Joyce Harris, Sellers, Thomas, Barnnet, Junkin, Acker, Presley, Smith, and Garner then filed a motion to dismiss under Federal Rule 12(b)(6). Approximately one month later, before the district court ruled on the motion, Gray dismissed her claims against those defendants, thus leaving only Bostic and Sexton as the remaining two defendants.

On November 25, 2003, Bostic and Sexton, in their official and individual

4

capacities, moved to dismiss Gray's complaint based on absolute, statutory, and qualified immunity, which the district court granted.  On February 12, 2004, Gray moved to alter, amend, or vacate the judgment, or in the alternative, to amend her complaint.  The district court denied that motion.

### 2. *Gray I*[3]

Gray appealed the district court's orders dismissing her claims against Bostic and Sexton and denying her leave to amend her complaint.  On December 27, 2004, in an unpublished, per curiam opinion, this court reversed the judgment of the district court with respect to the claims against Bostic and Sexton in their individual capacities and remanded the case for further proceedings.  This court concluded that, as to Bostic, Gray's allegations sufficiently alleged a constitutional violation that was clearly established on that date.  Further, as to Sexton, this court noted that Gray's amended complaint remedied any problems with her original pleading.  Thus, her amended complaint sufficiently alleged a constitutional violation against Sexton.  This court instructed that Gray would be able to pursue her Fourth Amendment handcuffing claims against Bostic and Sexton only in their individual capacities under her amended complaint.

On remand, Gray filed an amended complaint asserting claims of excessive

---

[3] Gray ex rel. Alexander v. Bostic, 127 F. App'x 472 (11th Cir. 2004) ("Gray I").

5

use of force and unreasonable seizure against Bostic and Sexton individually. Discovery ensued.  Sexton and Bostic then moved for summary judgment on September 8 and 9, 2005, respectively, on the bases of, *inter alia*, qualified immunity.  The district court denied their motions for summary judgment on December 12, 2005.

### 3. *Gray II*[4]

Bostic and Sexton appealed that decision on December 19, 2005.  This court (Hull, J.) reversed the district court's order denying Sexton qualified immunity but upheld the decision as to Bostic.  Specifically, as to Bostic, this court held that the handcuffing was excessively intrusive and was an "obvious violation of Gray's Fourth Amendment rights."  Gray II, 458 F.3d at 1306-07.  The case was remanded and was ordered to proceed only against Bostic on Gray's illegal seizure claim and for declaratory and injunctive relief.  Bostic's petition for rehearing en banc with this court was denied.

### 4. *Trial*

The district court conducted a jury trial on January 16, 2007.  At the close of Gray's evidence, based upon Bostic's proffer, the district court declined to allow any defense witnesses or exhibits to be offered into evidence.  It then granted

---

[4] Gray ex rel. Alexander v. Bostic, 458 F.3d 1295 (11th Cir. 2006) ("Gray II").

Gray's oral motion for judgment as a matter of law on the issue of liability. The issue of damages was submitted to the jury, and after brief deliberations,[5] one dollar in nominal damages was awarded to Gray. Judgment was entered on even date.

### 5. *Gray III*[6]

Gray filed two motions for attorney's fees. On February 14, 2007, Bostic appealed the district court's judgment against him to this court. The district court denied Gray's two pending motions for attorney's fees, allowing Gray to re-file after this court ruled on Bostic's appeal. This court heard oral argument on February 6, 2008, and in a per curiam opinion, affirmed the decision of the district court granting judgment as a matter of law against Bostic.

---

[5] Forty-five minutes after receiving the case, the jury returned to the courtroom with a question regarding compensatory damages and whether they have to be proven. After the response was sent to the jury, deliberations ensued for sixteen minutes. At that time, the jury asked the court: "What is the allowable amount that can be awarded? Is there a minimum and a maximum; and if so, what are they?" The district judge answered that "[t]here is, technically, no minimum and no maximum. But as a practical matter, in terms of the maximum, I would consider any award of more than $30,000 to be unreasonable." The judge then explained that if the jury finds that Gray has not suffered any mental anguish damages, then she is only entitled to nominal damages ranging from one dollar to one hundred dollars. Deliberations then continued for a mere four minutes until the jury reached a verdict of one dollar.

[6] Gray ex rel. Alexander v. Bostic, 264 F. App'x 856 (11th Cir. 2008) ("Gray III").

6. *Gray IV*[7]

Again, Gray filed two motions for attorney's fees. On July 29, 2008, without hearing, the district court granted Gray's motions for attorney's fees, expenses of litigation, and costs in a total amount over $70,000. Bostic appealed this decision on August 20, 2008. On June 12, 2009, this court (Carnes, J.) vacated the district court's July 29, 2008, order and remanded the case for further proceedings.

On August 2, 2010, this court (Carnes, J.) rescinded its earlier opinion of June 12, 2009, and supplanted it with a new opinion, which also vacated the district court's previous award of attorney's fees. This court clarified that the "issue [was] whether the district court abused its discretion under 42 U.S.C. § 1988 by awarding Gray attorney's fees even though the jury awarded her only $1.00 in nominal damages for Bostic's violation of her Fourth Amendment right to be free from illegal seizure." Gray IV, 613 F.3d at 1038. This Gray IV court noted that the district court, in deciding that an award of fees and expenses was warranted notwithstanding the nominal amount of damages, had relied on the fact that the one published opinion to have previously come out of the litigation, Gray II, had been cited in more than fifty other cases. In measuring the "public purpose

---

[7] Gray ex rel. Alexander v. Bostic, 570 F.3d 1321 (11th Cir. 2010) ("Gray IV").

8

served" of the legal issue, see Farrar v. Hobby, 506 U.S. 103 (1992), the district court had relied on this significant number of citations. In Gray IV, this court held that the district court had misapplied the law and had overstated the impact of that decision because the substantive law Gray II established had only been cited twice by other courts.

This Gray IV court clarified that Gray II's substantive point of law was narrow: that a law enforcement officer, acting as a school resource officer, who handcuffs a compliant nine-year-old child for purely punitive purposes has unreasonably seized the child in violation of the Fourth Amendment. The district court had erred by counting decisions that cited Gray II for general principles of law that were already well established or for holdings on issues and claims upon which plaintiff had failed to prevail. This court provided direction that if the district court chose to count citations to Gray II to determine the "public purpose served," it should only count those that cite Gray II for its Fourth Amendment holding.

Further, this court pointed out in Gray IV another troubling aspect of the district court's order: the district court considered the "fact" that civil rights cases are unattractive to attorneys in the Northern District of Alabama because those attorneys have to advance expenses and take the cases on a contingency basis with

9

delayed payment.  This court reasoned that if those reasons justified an award of fees and expenses in nominal damages cases in one district, they would justify such an award in every district.  However, the Supreme Court had stated that usually the only reasonable fee in nominal damage cases is no fee at all.  Farrar, 506 U.S. at 115.  Thus, the district court's reasoning was the inverse of that statement, effectively turning Farrar around so that in a nominal damages case there would usually be a fee award.  This court then directed the district court to apply the Farrar principles in granting a reasonable award of attorney's fees.

Lastly, this court noted that the district court may have employed its decision on the expenses and fee issue as an "end-run around the jury's nominal damages award."  Gray IV, 613 F.3d at 1043.  In the district court's order, it referred to the jury's verdict as "abundantly unsupported by the evidence" and later noted that the jury's decision not to award any actual damages was "considerably unsupported by the evidence."  This court acknowledged that it was uncertain that Farrar permits a judge to factor into his attorney's fees decision his doubts about the validity of the jury's still-standing nominal damages verdict.  This court declined to explore that issue because it was pretermitted by the decision to vacate the district court's order on other grounds.  Moreover, the presiding district judge had retired.  This court had no reason to believe that the new judge would use

10

similar reasoning.  This court also denied the suggestion of rehearing en banc. Gray ex rel. Alexander v. Bostic, 625 F.3d 692 (11th Cir. 2010).

   *7.  Background of this Appeal (Gray V)*

   This court remanded this matter, leaving the district court to decide "whether the plaintiff is entitled to an award of attorney's fees and expenses under 42 U.S.C. § 1988 even though she recovered only nominal damages."  Gray IV, 613 F.3d at 1046.  The district court ordered the parties to re-brief the attorney's fee issue in light of this court's recent guidance.  On March 5, 2012, the district court entered an order granting in part Gray's motion for attorney's fees, and on March 30, 2012, the district court entered an order granting attorney's fees for the previous appeal.  Altogether, the court awarded Gray a total sum of over $39,900. It is from these orders that Bostic now appeals.

## II. STANDARD OF REVIEW

   "We review a district court's order awarding attorney fees for an abuse of discretion," which occurs if the court "fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous."  ACLU v. Barnes, 168 F.3d 423, 427 (11th Cir. 1999) (internal quotations omitted).  An abuse of discretion also occurs

11

when a district court commits a clear error of judgment.  See United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).  "The abuse of discretion standard usually implies a range of choices, instead of only one right choice, and often we will affirm even though we would have decided the other way if it had been our choice."  Gray IV, 613 F.3d at 1039.  Even though determining a reasonable attorney's fee is a matter committed to the sound discretion of a trial judge, the judge's discretion is not unlimited.  Id. (internal quotations omitted).

## III. DISCUSSION

A plaintiff who wins nominal damages is a prevailing party under 42 U.S.C. § 1988.  Farrar, 506 U.S. at 112; see 42 U.S.C. § 1988 ("[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . .").  "Although the 'technical' nature of a nominal damages award or any other judgment does not affect the prevailing party inquiry, it does bear on the propriety of fees awarded under § 1988."  Farrar, 506 U.S. at 114.

"In some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all.  A plaintiff who seeks compensatory damages but receives no more than nominal damages is often such a prevailing

12

party." Id. at 115. This is because, *inter alia*, "the awarding of nominal damages also highlights the plaintiff's failure to prove actual, compensable injury." Id. "When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." Id.[8]

The majority opinion in Farrar provides one consideration, and little other guidance, for district courts considering granting attorney's fees after a nominal damages award. Justice O'Connor's concurrence articulates two additional factors. As discussed in the majority opinion, the most critical factor in determining the reasonableness of an attorney's fee award is the degree of success

---

[8] The touchstone of the attorney's fee inquiry is reasonableness. See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (explaining that a prevailing party status merely brings the plaintiff across the statutory threshold and that the district court must then determine what fee is reasonable); see also Trezevant v. Tampa, 741 F.2d 336, 341 (11th Cir. 1984) ("But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained."). However, in this jumble of litigation including eleven original defendants, eight separate claims, capacities both official and individual, five appeals, many depositions, motions, and over one hundred forty docket entries, we are left with one defendant, one incident of obvious liability, and one dollar in nominal damages. It is axiomatic that a prevailing party must demonstrate that there is a genuine relationship or connection between the efforts expended and the result obtained. See Hensley, 461 U.S. at 434-35 (noting that a plaintiff may present various claims for relief based on different facts or legal theories and that, in such cases, "work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved") (internal quotations omitted); Trezevant, 741 F.2d at 341 ("The trial court correctly recognized that the fee award should exclude the time spent on unsuccessful claims except to the extent that such time overlapped with related successful claims."). Here, even the most attentive court would struggle to discern the nature and extent of the time, talent, and expense which contributed to the one dollar verdict.

obtained.  Id. at 114.  "Other factors, including the significance of the legal issue on which the plaintiff prevailed and the public purpose served, go into determining whether a plaintiff's victory is substantial enough to make it one of those *unusual* nominal damages cases where the defendant is required to pay the plaintiff's attorney's fees."  Gray IV, 613 F.3d at 1040 (internal quotations omitted) (emphasis added); see Farrar, 506 U.S. at 121-22 (O'Connor, J., concurring).  After considering the above mentioned factors in the context of this litigation, the *de minimis* nature of Gray's victory is apparent; her victory is not substantial enough to justify an award of attorney's fees.  Our opinion discusses the three Farrar factors *seriatim*.

## A. Degree of Success Obtained

The most critical factor is the degree of success obtained.  Farrar, 506 U.S. at 114.  When considering this factor, we must compare the amount of damages sought to the amount awarded.  See id. (explaining that the district court is "obligated to give primary consideration to the amount of damages awarded as compared to the amount sought") (internal quotation marks omitted).  "[A] substantial difference between the judgment recovered and the recovery sought suggests that the victory is in fact purely technical."  Id. at 121 (O' Connor, J., concurring).  Here, this factor weighs against the award of attorney's fees.

14

Certain facets of the litigation in our case bear a strong resemblance to Farrar. In Farrar, the plaintiffs operated a school for delinquent, disabled, and disturbed teens. The state indicted one of the plaintiffs for murder after a student died due to an alleged willful failure to administer proper medical treatment and failure to provide timely hospitalization. After the state shut down the plaintiffs' school, the plaintiffs filed suit against the state officials responsible for the closing. In the complaint, the plaintiffs alleged "deprivation of liberty and property without due process by means of conspiracy and malicious prosecution" and sought $17 million in damages and injunctive relief under 42 U.S.C. §§ 1983 and 1985. Farrar, 506 U.S. at 106 (majority opinion). The jury concluded that Defendant Hobby, the then Lieutenant Governor of Texas, had deprived Plaintiff Joseph Farrar of a "civil right" and awarded him nominal damages. However, the jury refused to award any other damages for this violation because it found that Hobby's conduct was not a proximate cause of any injury suffered by Farrar.

Despite the nominal award, the Supreme Court determined that the plaintiffs were "prevailing parties" under 42 U.S.C. § 1988, because they nonetheless succeeded on a significant issue in litigation which achieved some of the benefit the parties sought in bringing suit. Id. at 109. The Court noted, however, that the technical nature of nominal damages can affect the propriety of awarding fees

15

under § 1988.  "Once civil rights litigation materially alters the legal relationship between the parties, the degree of the plaintiff's overall success goes to the reasonableness of a fee award . . . ."  Id. at 114 (internal quotation marks omitted). As noted above, the Court held that the "most critical factor" in determining the reasonableness of a fee award is the "degree of success obtained."  Id.

The Court then described when no fees are appropriate.  "[D]amages awarded in a § 1983 action must always be designed to compensate injuries caused by the [constitutional] deprivation."  Id. at 115 (alteration in original) (internal quotation marks omitted).  "When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all."  Id. (citation omitted).

Applying its legal conclusions, the Farrar Court recognized that the plaintiffs had sought $17 million in compensatory damages but only received $1 in nominal damages.  The Court described the litigation as having accomplished little beyond giving the plaintiffs the "moral satisfaction of knowing that a federal court concluded that [their] rights had been violated in some unspecified way."  Id. at 114 (alteration in original) (internal quotation marks omitted).  The plaintiffs' victory was a technicality and was not the kind of legal change that Congress sought to promote in the fee statute.  Id. at 119 (O'Connor, J., concurring).  Thus,

16

even though the Fifth Circuit erred in failing to recognize that petitioners were prevailing parties, the Supreme Court affirmed the Fifth Circuit's reversal of the district court's fee award.  Id. at 116 (majority opinion).

Like the plaintiffs in Farrar, Gray achieved very limited success in this case; she asked for a large amount of money and received a nominal award.  True, she did not seek $17 million.  But the difference remains substantial between the $25,000 that she sought and the nominal award she received.[9]  For the purposes of measuring the degree of success Gray obtained, the "substantial difference between the judgment recovered and the recovery sought suggests that the victory is in fact purely technical," id. at 121 (O' Connor, J., concurring).  As the district court concluded, this first factor—the most important of the three—weighs heavily against Gray.

## B. Significance of the Legal Issue

Even though we conclude that the first and most important factor weighs against an attorney's fee award, Justice O'Connor's concurring opinion in Farrar reminds us that not all nominal damages awards are *de minimis*.  Id. at 121 ("Nominal relief does not necessarily a nominal victory make.").  This is because "an award of nominal damages can represent a victory in the sense of vindicating

---

[9] The difference is substantial particularly in light of the appearance that the jury did not consider Gray's mental anguish damages proven.  See supra n.5.

17

rights even though no actual damages are proved." Id.  Thus, Farrar allows us to also consider the significance of the legal issue on which the plaintiff claims to have prevailed.

This second Farrar factor "is concerned with the general legal importance of the issue on which the plaintiff prevailed." Mercer v. Duke Univ., 401 F.3d 199, 206 (4th Cir. 2005); accord Mahach-Watkins v. Depee, 593 F.3d 1054, 1062 (9th Cir. 2010) (noting the importance of the legality of state-sanctioned force resulting in death); Piper v. Oliver, 69 F.3d 875, 877 (8th Cir. 1995) (noting the significance of the plaintiff's right to be free from illegal detention); Milton v. City of Des Moines, 47 F.3d 944, 946 (8th Cir. 1995) (noting that the civil right the plaintiff sought to vindicate in his excessive force claim was a significant issue).  The district court concluded that this factor weighs in favor of granting attorney's fees because Gray changed the law and announced a rule that has benefitted other students.  We disagree and conclude that the second factor, like the first, weighs against a fee award.

In the entirety of these proceedings, Gray was able to demonstrate that Bostic violated the Fourth Amendment and that he was not entitled to qualified immunity.  See Gray II, 458 F.3d at 1306-07.  More pointedly, we held that Bostic's "conduct in handcuffing Gray, a compliant, nine-year-old girl for the sole

18

purpose of punishing her was an *obvious violation* of Gray's Fourth Amendment rights." Id. at 1307 (emphasis added). As Bostic's appellate brief correctly pointed out, it is axiomatic that government actors are not immune from obvious violations of one's constitutional rights. This is a long-standing principle of civil rights law, and nothing in Gray's litigation deviates from this principle. Simply put, Gray's litigation did not "change the law."

Nor will Gray's litigation aid qualified immunity litigation in future cases. The "obvious clarity" reasoning upon which the Gray II court relied applies to make certain egregious conduct unconstitutional notwithstanding the lack of precedential, fact-specific case law. See Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002). The Gray II court concluded that Bostic's conduct far surpassed the "hazy border" of action teetering on the edge of unconstitutionality. See Gray II, 458 F.3d at 1307 (noting that Bostic's conduct went "well beyond the hazy border that sometimes separates lawful conduct from unlawful conduct, such that *every objectively reasonable officer would have known* that the conduct was unlawful") (emphasis added) (internal quotation mark omitted). The district court reasoned that Gray's litigation offers a precedential example of such "obvious" conduct. However, since every objectively reasonable officer would have known

19

that Bostic's conduct violated the Constitution, then the significance of the case as a precedential example is greatly diminished.

It is true that Gray prevailed on the issue of whether her civil right was violated. But her victory did not alter the landscape of civil rights law in the public schools. Nor could it have. As we concluded, her victory was wholly determined by the legal landscape Gray now claims it altered. The cases that have cited to Gray II prove the point. In only three cases is Gray II cited for anything more than a general legal proposition that could be supported by numerous other legal authorities. See El-Ghazzawy v. Berthiaume, 636 F.3d 452, 458 (8th Cir. 2011); C.B. v. Sonora Sch. Dist., 691 F. Supp. 2d 1170, 1179–82 (E.D. Cal. 2010); E.W. v. Wake Cnty. Bd. of Educ., No. 5:09-CV-198-FL, 2010 WL 1286218, at *7 (E.D.N.C. Mar. 30, 2010). Even those cases cannot use Gray II for any groundbreaking legal point. In El-Ghazzawy, the Eighth Circuit uses Gray II to support the broad proposition that an officer may violate the Fourth Amendment by, among other actions, handcuffing someone in the absence of a threat to anyone's safety. 636 F.3d at 458. Similarly, E.W. simply cites Gray II as an example of a Fourth Amendment violation that involved an officer binding a student. 2010 WL 1286218, at *7. And in C.B., the district court for the Eastern

District of California only quotes <u>Gray II</u> at length without commenting on it or applying it in any meaningful way.  691 F. Supp. 2d at 1179–82.

Gray prevailed, but her victory carries very little legal significance, if any at all.  The second factor therefore weighs against a fee award.

## C. Public Purpose Served

We next address the public purpose served.  Gray's success "might be considered material if it also accomplished some public goal other than occupying the time and energy of counsel, court, and client."  <u>Farrar</u>, 506 U.S. at 121-22 (O'Connor, J., concurring).  This factor principally relates to whether the victory vindicates important rights and deters future violations.  <u>Cartwright v. Stamper</u>, 7 F.3d 106, 109 (7th Cir. 1993); <u>see</u> <u>Farrar</u>, 506 U.S. at 122 (O'Connor, J., concurring).

Other circuits have had greater opportunity to address the application of this factor.  Some courts appear to analyze it in more generous terms, "concluding that a public goal is accomplished if the plaintiff's victory encourages attorneys to represent civil rights litigants, affirms an important right, puts the defendant on notice that it needs to improve, and/or provokes a change in the defendant's conduct."  <u>Barber</u>, 254 F.3d at 1232; <u>see, e.g.</u>, <u>O'Connor v. Huard</u>, 117 F.3d 12, 18 (1st Cir. 1997) (noting that the plaintiff's victory provided an incentive to

21

attorneys to represent civil rights litigants and that it served as a deterrent to future abuses). On the other hand, other courts appear to read the factor as requiring a more compelling showing of the public good that is being advanced. Barber, 254 F.3d at 1231 ("Some courts appear to read the [third] factor restrictively."); see, e.g., Pino v. Locascio, 101 F.3d 235, 239 (2d Cir. 1996) (noting that "not every tangential ramification of civil rights litigation *ipso facto* confers a benefit on society").

We find the reasoning of certain Seventh Circuit opinions to be instructive and therefore decline the more lenient suggestion of the First Circuit as found in Huard, 117 F.3d at 18. The Huard Court recognized the importance of providing an incentive to attorneys to represent civil rights litigants whose claims may not result in substantial monetary compensation as a factor warranting the grant of attorney's fees. Id. Providing an incentive for representing civil rights litigants is something that every attorney's fee award accomplishes. Simply stated, such reasoning would justify an attorney's fee award in every case. This logic flouts the Supreme Court's recommendation that in nominal damages cases "the only reasonable fee is usually no fee at all." Farrar, 506 U.S. at 115; see also Gray IV, 613 F.3d at 1042 (noting that the consideration of incentivizing attorneys to take civil rights cases as a factor for granting an attorney's fees award would justify an

22

award for such fees in every case, thus belying Farrar's admonition that in nominal damages cases the only reasonable fee is usually no fee at all).  Applying the First Circuit's reasoning would thus turn the Supreme Court's statement around so that there would usually be a fee award in a nominal damages case.  Gray IV, 613 F.3d at 1042.

In Cartwright, 7 F.3d 106, the plaintiffs brought a § 1983 action against the superintendent of the Indiana state police and an officer, alleging, *inter alia*, that the defendants violated the plaintiffs' Fourth Amendment rights by an unauthorized entry into their apartment.  The plaintiffs' case against the officer went to trial, where the jury found in favor of the plaintiffs but only awarded them one dollar in nominal damages on each of their claims.  The district court then awarded attorney's fees in the amount of $52,875.  On appeal, the Seventh Circuit reversed the award after analyzing the three Farrar factors.  As to the public purpose served, the Seventh Circuit noted that "[t]he more important the right at stake and the more egregious the violation the more likely it is that the victory serves a public purpose.  An award of punitive damages, therefore, is strong evidence that the victory served a public purpose." Id. at 109.  Because the district court granted a directed verdict in favor of the defendant on the claim for punitive damages, and because the future deterrent effect of the action was limited, the

23

court of appeals held that the factor weighed firmly in favor of finding the victory technical.  Id.

The Seventh Circuit addressed a similar situation in Maul v. Constan, 23 F.3d 143 (7th Cir. 1994).  In Maul, an inmate brought a § 1983 action against prison officials, alleging that the forced administration of psychotropic medication violated his constitutional rights.  The district court awarded the plaintiff $22,500 in compensatory damages and granted the plaintiff $18,542.93 in attorney's fees, which were paid to his attorney.  The Seventh Circuit reversed and remanded.  On remand, one dollar in nominal damages was awarded to the plaintiff, and the defendants moved pursuant to Federal Rule of Civil Procedure 60(b)(5) for a refund of the attorney's fees previously paid to the plaintiff's attorney.  After applying the three Farrar factors, the Seventh Circuit held that the district court abused its discretion by awarding attorney's fees to the plaintiff.  As to the public purpose served, the Court of Appeals reasoned that

> since all § 1983 claims seek to redress the deprivation of rights, privileges[,] and immunities secured by the Constitution and laws, this factor is not satisfied merely because the plaintiff establishes, as he did here, that his constitutional rights have been infringed. Instead, this Court must scrutinize plaintiff's complaint to determine whether the allegations made and the relief sought evince a public purpose rather than merely attempt to redress a private injury.

24

Id. at 146.  In examining the plaintiff's complaint, the Maul court concluded that "his complaint indicate[d] a more limited objective, redressing his private injury." Id.  Specifically, the Maul plaintiff "failed to establish anything more than that he had been denied a protected right: he did not establish that he had suffered actual injury (hence the award of only nominal damages); he did not obtain an injunction prohibiting future violations; and he did not establish that the defendants' conduct was sufficiently reprehensible to warrant punitive damages."  Id. at 146-47.

At oral argument, Gray's counsel attempted to couch this case as evincing a public purpose.  However, after applying the reasoning found in the above mentioned Seventh Circuit cases, it is clear that Gray commenced the litigation to redress private injury, and it does not serve a public purpose.  Like the plaintiff in Maul, Gray failed to establish anything more than that she had been denied a protected right.  Despite her numerous claims, Gray was unable to establish that she suffered actual injury.  Similar to the plaintiffs in Cartwright, Gray specifically sought, but failed to obtain, punitive damages for those claims.  Even though Gray did allege and seek a declaration that Sexton instituted or engaged in a custom or policy of failing to train deputies on the detention of students, her prayer for injunctive relief failed because there was no evidence of such a policy or custom. Gray II, 458 F.3d at 1309-10.  Instead, an examination of Gray's relief sought and

25

obtained makes clear that the primary purpose of her lawsuit was the recovery of private damages.[10]  Thus, the third Farrar factor weighs against an award of attorney's fees.

Moreover, the district court applied an improper legal standard when it misstated the potential deterrent effect of Gray's litigation.  The district court reasoned that Gray's litigation accomplishes a public purpose because Gray II deters unconstitutional behavior "*if* attorney's fees are awarded."  (Doc. no. 135, at 17.)  It also stated that "[h]ere, the *only way* to make Gray's success meaningful, and substantively benefit the public, is to provide a deterrent against the illegal conduct."  (Id. at 19) (emphasis added).  In essence, the district court acknowledged that there is no public purpose of deterrence in this litigation absent an attorney's fee award.

Here, the district court actually used attorney's fees *as* the deterrent.  The deterrence of civil rights violations, however, is accomplished by a multitude of other factors, including: the expense and other burden of protracted litigation, the possibility of compensatory damages for physical and emotional injuries, and the

---

[10]  For example, in support of Gray's claims against Sexton, Gray alleged in her amended complaint that Sexton and the Tuscaloosa County Sheriff's Department implemented an unconstitutionally discriminatory policy against African American individuals.  At our oral argument, it was revealed that Gray declined to pursue those allegations upon learning at trial that Bostic was also African American.

26

threat of punitive damages.  By choosing to award attorney's fees as the deterrent, the district court ignored this court's admonition in <u>Gray IV</u> not to make the award of attorney's fees an "end-run around the jury's nominal damages award."  <u>Gray IV</u>, 613 F.3d 1043.  <u>Farrar</u> directs district courts to analyze the magnitude of a plaintiff's victory, despite a nominal damages award, to decide whether an award of attorney's fees is appropriate.  It does not direct the inverse–that a court should award attorney's fees in order to enhance the magnitude of a plaintiff's victory.  The district court's reasoning and use of an inappropriate legal standard constitutes an abuse of discretion.  <u>See</u> <u>ACLU</u>, 168 F.3d at 427 (noting that a district court abuses its discretion if it fails to apply the proper legal standard or to follow proper procedures in making the determination to award attorney's fees).

## IV. CONCLUSION

Having weighed the <u>Farrar</u> factors, we conclude that Gray achieved a *de minimis* victory.  The district court abused its discretion by awarding attorney's fees to Gray.  Accordingly, the district court's order awarding attorney's fees is **REVERSED**, and the action is **REMANDED** for the entry of judgment in favor of Defendant Bostic on Plaintiff Gray's claim for attorney's fees.

27

WILSON, Circuit Judge, dissenting:

I find no abuse of discretion on the part of the district judge in awarding attorney's fees to Laquarius Gray, the prevailing party in this litigation.

The majority correctly notes that the Supreme Court's opinion in Farrar announced a three-factor calculus for determining attorney's fees awardable to a party who prevails under 42 U.S.C. § 1988 despite receiving nominal damages. See Majority Op. at 13–14. As far as the first factor is concerned—the degree of success obtained by Gray—I agree with the majority that it weighs in Bostic's favor. Gray sought somewhere between $25,000 and $40,000 in damages against Bostic, and she wound up with $1. Yet while I concede that the first Farrar factor favors Bostic, an unsuccessful claim for $25,000 cannot possibly sink the scales as much as an unsuccessful claim for $17 million, the amount sought by the plaintiff in Farrar. See Farrar v. Hobby, 506 U.S. 103, 106, 113 S. Ct. 566, 570 (1992). A $24,999 failure is materially different from a $16,999,999 failure, and not all successes (or failures) are created equal — we should evaluate the *degree* of success. So while I agree with the majority that the first Farrar factor favors Bostic, I cannot say that it "weighs heavily." Majority Op. at 17.

The second Farrar factor — the significance of the legal issue — weighs in favor of Gray in my view. The majority opinion emphasizes that Bostic's

28

handcuffing of Gray was an "*obvious violation* of Gray's Fourth Amendment rights." Id. at 18 (emphasis in original) (internal quotation marks omitted). Because it was an "obvious violation," says the majority opinion, Gray's litigation could not possibly be significant, because she did not "change the law." Id. at 18–19. By this logic, any future decision by this court that denies qualified immunity to a government actor will be deemed insignificant, because *every* denial of qualified immunity stems from "obvious" constitutional violations. See Gray ex rel. Alexander v. Bostic (Gray II), 458 F.3d 1295, 1307 (11th Cir. 2006). In my view, Gray's achievement in defeating Bostic's qualified immunity in the district court was quite significant: in November 2003, Bostic successfully moved the district court to dismiss Gray's complaint on qualified immunity grounds; Gray appealed that decision, won, and on remand defeated Bostic's motion for summary judgment on qualified immunity grounds; again Bostic appealed, and again Gray successfully persuaded this court that Bostic should not receive qualified immunity. See Majority Op. at 4–6. Yet despite all of this, and even though a federal judge originally *granted* Bostic qualified immunity, the majority concludes that Gray's victory was a foregone, "obvious" conclusion. Again, I cannot agree. Gray's victory was protracted, hard fought, and hardly "obvious." I would hold that the second factor weighs in her favor.

29

Finally, I turn to the third Farrar factor, whether Gray's litigation "accomplished some public goal other than occupying the time and energy of counsel, court, and client." Farrar, 506 U.S. at 121–22, 113 S. Ct. at 578 (O'Connor, J., concurring). I disagree with the majority's conclusion that incentivizing the vindication of civil rights through attorney's fees should not bear on this final factor. If that were the case, the majority warns, "such reasoning would justify an attorney's fee award in every case." Majority Op. at 22. Justice O'Connor's concurrence seemed to implicitly accept the private attorney general theory: "The District Court speculated that the judgment, if accompanied by a large fee award, might deter future lawless conduct, but did not identify the kind of lawless conduct that might be prevented." Id. at 122, 113 S. Ct. 578–79 (O'Connor, J., concurring) (citation omitted). Justice O'Connor rejected that approach in Farrar, not because incentivizing civil rights attorneys was improper, but because the district court was unclear as to "the kind of lawless conduct that might be prevented." Id. at 122, 113 S. Ct. at 579 (O'Connor, J., concurring). Here, by contrast, the future conduct that will be prevented because of Gray's efforts is entirely clear: grade-schoolchildren may not be handcuffed by government actors simply because they act disrespectfully towards a teacher. I would hold that the third factor favors Gray.

30

Twice, a district court has awarded Gray attorney's fees. And twice, this court has struck down that award. A district court's discretion in determining an award of attorney's fees to a prevailing party is necessarily broad, because "the [district court judge] 'has far better means of knowing what is just and reasonable than an appellate court can have.'" Copeland v. Marshall, 641 F.2d 880, 901 (D.C. Cir. 1980) (en banc) (quoting Trustees v. Greenough, 105 U.S. 527, 537, (1882)). Especially where the district court is "intimately familiar with the barrage of pleadings, memoranda, and documents filed," it is preferable to have that decision made "by the court which has been most intimately connected with [the] case." Id. (internal quotation marks omitted).

I would conclude that although the first Farrar factor weighs in favor of Bostic, the district court did not abuse its discretion in concluding that the second and third factors weigh in favor of Gray. I dissent.

31