[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13722

_____

BENJAMIN F. MERCER,

Plaintiff-Appellee,

*versus*

ALABAMA DEPARTMENT OF TRANSPORTATION,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:16-cv-01204-RDP

_____

Before JILL PRYOR, LUCK, and BRASHER, Circuit Judges.

LUCK, Circuit Judge:

Benjamin Mercer, an African-American man, sued the Alabama Department of Transportation, his former employer, under Title VII of the Civil Rights Act for race discrimination. A jury found that the department's decision to fire Mercer was motivated by race—but also found that he would have been fired for a race-neutral reason even if the department hadn't considered his race. After this mixed motive verdict, the district court awarded Mercer attorney's fees.

The department argues on appeal that the district court erred in overruling its objection to comparator evidence, in denying its motions for judgment as a matter of law, and in applying the wrong legal standard to award Mercer attorney's fees. After careful consideration, and with the benefit of oral argument, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### Mercer's Employment and Termination

Mercer was hired by the department in 2008 as a transportation technologist. His duties included inspecting concrete plants, reviewing records related to concrete production, and inspecting concrete batching equipment, delivery trucks, and the raw materials needed to make concrete, in order to ensure compliance with the department's standards. The concrete Mercer inspected was used by the department to build roads, bridges, and other

transportation-related infrastructure. The majority of Mercer's time was supposed to be spent inspecting concrete plants, reviewing "mix designs" (the "recipes" for the concrete), testing concrete, and logging the test results.

Mercer's supervisor was Audrey Perine, who was an African-American woman. Brian Davis, who was white, was in charge of Mercer's division and supervised Perine. Under the department's rules, insubordination, falsification of records, or "a serious violation" of other rules, were offenses that could result in discharge for the first offense. Prior to his termination, Mercer had never been disciplined and his performance evaluations "exceed[ed] standards." Perine described Mercer as "a very good employee."

When Mercer conducted concrete plant inspections, he had to fill out a checklist. Between August 2011 and March 2012, Mercer was responsible for inspecting thirty-eight plants at least once a month. The department gave Mercer a vehicle to use when inspecting plants. This vehicle came equipped with Global Positioning System tracking.

Mercer didn't always take his state vehicle to inspect the plants. He sometimes took his personal vehicle or got rides from workers at the plants. It generally took Mercer "four to [fifteen] minutes" to inspect a plant. He would make sure that the raw materials for concrete weren't comingled together by "visually eyeball[ing]" the bins for the sand, stone, and gravel—usually from his truck. He would then enter the plant, get an inspection checklist,

and fill it out.  According to Mercer, he filled out an inspection checklist only when he personally visited and inspected a plant, and he filled out a checklist for every inspection he performed.

But there were issues with the inspection records Mercer submitted.  For example, Mercer submitted forms saying that he inspected two plants on September 26, 2011, but he was at a conference that day.  Mercer also submitted forms saying that he inspected three plants on December 20, 2011, even though he didn't work that day.  Mercer maintained that he "inspected those plants" and the date on the forms "could be wrong."  He insisted that he never falsified any records.  According to William Higgins, a subordinate who worked in the concrete lab under Mercer's supervision in 2011, Mercer once asked another subordinate to fill out a dozen inspection forms before Mercer did the inspections.

Mercer was also responsible for testing the concrete's strength.  He did so by taking sample cylinders of concrete from project sites and placing them in a compression machine that broke the cylinders, providing information about the concrete's strength.

There were issues with the strength tests that Mercer performed.  Mercer authorized the employees that he supervised to test the concrete cylinders and document the results in the department's concrete management system using his login information. When an employee used Mercer's login to record test results, the system would say that Mercer had performed the test.  Perine had authorized Mercer to let other employees use his login to perform tests and log the results.  But one employee worked under Mercer

at the time he was let go in 2012, and this person wasn't certified to perform the strength tests.

Higgins witnessed Mercer improperly handle the concrete cylinders during the strength tests. For consistent results, the cylinders had to be kept in a lime bath at all times to keep them moist and within a certain temperature range. The cylinders also had to be broken at specific times—some samples had to be tested seven days after they were made, and some samples had to be tested after twenty-eight days. Higgins once saw Mercer leave close to a hundred cylinders exposed to the air because the lime bath was full. Higgins also saw Mercer regularly break cylinders ahead of schedule because "he wanted Fridays to be an easy day" or he wanted to work around holidays, but Mercer would log the cylinders in the system as having been broken when they were scheduled to be tested.

In 2011, the department began investigating concrete used in a rural bridge project. Some of the concrete meant for the bridge's columns yielded "low compressive strength tests," so the department launched an investigation into "the root cause of the issue." Andrew Waldrop and Shannon Golden, who worked for the department's bureau of materials and tests, traced the defective concrete to two specific plants. They then visited the plants and discovered "a lack of documentation" as to quality control testing. Mercer was responsible for inspecting these two plants. Waldrop found no indication that Mercer had inspected them.

Waldrop then investigated eight plants that Mercer was responsible for inspecting to see if the problem was "isolated" or "widespread." He found that one plant hadn't been inspected between October 2011 and February 2012. And Waldrop found problems "with all of the plants that [he] inspected." There were missing inspection documents from October 2011 to February 2012 at each of the eight plants that Waldrop investigated.

As a result of Waldrop and Golden's investigation, the department decided to terminate Mercer. Davis, the head of Mercer's division, recommended that he be terminated. The department held a "pre-dismissal conference" on May 11, 2012, where Mercer responded to the accusations against him. John Cooper, the department's director, made the final decision to fire Mercer on June 7, 2012.

Mercer's discharge letter, signed by Cooper, explained that Mercer was being terminated for failing to perform his job properly, insubordination, falsifying records, and violating the department's testing policies. The letter said that the investigation into Mercer showed that he falsified inspection documents and "failed to properly inspect a number of plants." The letter provided examples of dates where Mercer had claimed to have inspected a plant, but tracking records showed he had been at the plant for only a handful of minutes or hadn't been there at all. The letter also said that Mercer "allowed uncertified employees to test materials and enter the results under [his] login and password." In Cooper's

view, Mercer's misconduct was "the single-most egregious offense" he had encountered as the department's director.

Mercer's direct supervisor, Perine, played no role in the decision to fire him. Perine was the only African-American assistant engineer under Davis. According to Perine, Davis never allowed her to serve as acting division engineer in his absence but allowed white assistants to do so.

Davis also was inconsistent in how he handled Perine's recommendations to discipline employees. Perine supervised one white employee who would often show up to work so drunk that "he could not walk into the building." Perine reported the employee's inebriation to Davis, but Davis did not get back to her until hours later after the drunk employee's shift had already ended. In contrast, when Perine recommended a suspension for an African-American employee who failed to perform his job properly, left work without permission, and falsified records, Davis suspended him for two weeks.

Golden, one of the department employees who investigated Mercer, had previously been disciplined for misappropriating state property. On several occasions, Golden had taken three subordinates, a department truck, and department equipment, to perform "personal work" at his father's house. Golden then told the employees who did the work "to lie about what they had done." Golden's actions cost the state about $1,200. But Golden wasn't terminated for his misconduct; rather, the department only suspended him for thirty days.

*Mercer's Title VII Lawsuit*

Mercer sued the department for race discrimination under Title VII, alleging that it fired him for violating "work rules while treating differently a similarly situated white employee."[1] Mercer sought reinstatement, backpay, compensatory damages, declaratory and injunctive relief, and attorney's fees and costs.

The department moved before trial to exclude "comparator evidence" of Golden's misconduct—his use of state equipment to do work at his father's house and his resulting thirty-day suspension. The department argued that because Golden wasn't a valid comparator, given the differences between Mercer's and Golden's misconduct, evidence about Golden's misconduct and punishment was irrelevant and unfairly prejudicial. The district court disagreed and allowed Mercer to introduce the Golden comparator evidence at trial.

The case then proceeded to trial. The department moved for judgment as a matter of law at the close of Mercer's case, arguing that Mercer failed to prove that race influenced its decision to fire him. The district court denied the motion, concluding that a reasonable jury could find that Mercer's discharge was discriminatory. The department then renewed its motion after it rested. The department argued that Mercer had offered no evidence showing

---

[1] Mercer also brought a Title VII retaliation claim against the department. The district court granted summary judgment for the department as to the retaliation claim, and Mercer has not appealed the summary judgment.

that it was motivated to fire him because of racial discrimination. The district court again denied the motion, concluding that there were "clearly some decisions for the jury to make" as to Mercer's discrimination claim.

The jury found that Mercer had shown that his race was a motivating factor in the department's decision to fire him. But the jury also found that the department had shown it would have terminated Mercer for race-neutral reasons even if it had not taken his race into account when firing him.

After the verdict, the department renewed its motion for judgment as a matter of law. The district court denied the motion and instructed the parties to brief the question of what relief Mercer was entitled to following the jury's "mixed motive" verdict. Mercer moved for declaratory and injunctive relief, attorney's fees, and costs. The department, in turn, argued that an award of attorney's fees was inappropriate under the circumstances because it "could have fired [Mercer] for his misconduct regardless of any improper consideration."

The district court denied Mercer's request for declaratory and injunctive relief but granted him $165,091.50 in attorney's fees and $7,261.96 in costs. The district court explained that it had the discretion to award attorney's fees in a "mixed motive" case and, in determining whether to do so, it had to consider the "degree of success obtained by the plaintiff," "the facts of the given case," and the "severity of the [d]efendant's wrongdoing." The district court wrote that attorney's fees were appropriate here because "[t]his

was a hard fought case" and the mixed motive verdict for Mercer was "a victory on a significant legal issue that further[ed] a public goal." The jury found after a lengthy trial that Mercer's "race was a substantial motivating factor in his discharge" and, "[i]n the court's view, the jury was right." The district court reasoned that, "[u]nder the unique circumstances of this case," it would "decline[] to send the message that any degree of racism is okay, as long as the employer happens to have also considered other reasons."

## DISCUSSION

The department argues that the district court erred in: (1) allowing the jury to consider comparator evidence of Golden's misconduct and thirty-day suspension; (2) denying its motions for judgment as a matter of law because there was insufficient evidence that race was a motivating factor in Mercer's termination; and (3) awarding Mercer attorney's fees and costs. We address each argument in turn.

### Comparator Evidence of Golden's Misconduct

The department argues that the district court erred in allowing Mercer to introduce comparator evidence about Golden. Its "treatment of Golden, standing alone," could not "provide the jury a reasonable inference of discrimination," the department argues, because Golden was not "a similarly situated comparator." *See Lewis v. City of Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc) (holding that a plaintiff asserting a race discrimination claim "must demonstrate" at summary judgment "that she and her

proffered comparators were 'similarly situated in all material re-spects'").   Mercer responds that the comparator evidence was ad-missible as part of a mosaic of discrimination and to show that race was a motivating factor in his discharge.

"We review for abuse of discretion a district court's eviden-tiary rulings." *Sabal Trail Transmission, LLC v. 3.921 Acres of Land in Lake Cnty. Fla.*, 947 F.3d 1362, 1368 (11th Cir. 2020).  Irrel-evant evidence is inadmissible.  Fed. R. Evid. 402.  And a district court may exclude otherwise relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  Fed. R. Evid. 403.

Rule 403 "is an extraordinary remedy, which should be used only sparingly," and the balance "should be struck in favor of ad-missibility." *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006) (cleaned up).  In "reviewing issues under [r]ule 403, we look at the evidence in a light most favorable to its admission, maximiz-ing its probative value and minimizing its undue prejudicial im-pact." *United States v. Brown*, 441 F.3d 1330, 1362 (11th Cir. 2006). The balancing of rule 403's factors "is largely committed to the dis-cretion of the district court, which has far more experience in evi-dentiary matters and is better equipped to decide them than an ap-pellate court," and we will find an abuse of discretion under rule 403 "in only the rarest of situations." *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011).

Here, the district court concluded that the comparator evidence of Golden's misconduct was relevant, and its probative value wasn't substantially outweighed by the risk of unfairly prejudicing the department, confusing the issues, misleading the jury, or wasting time. This conclusion wasn't an abuse of discretion.

There are "a variety of ways" that "a plaintiff asserting an intentional[]discrimination claim under Title VII" can "make a sufficient factual showing to permit a reasonable jury to rule in [his] favor." *Lewis*, 918 F.3d at 1217. One way "is by navigating the now-familiar three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id.* "Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by proving, among other things, that [he] was treated differently from another 'similarly situated' individual—. . . a 'comparator.'" *Id.* (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258–59 (1981)). "[A] plaintiff asserting an intentional[] discrimination claim under *McDonnell Douglas* must demonstrate that [he] and [his] proffered comparators were 'similarly situated in all material respects.'" *Id.* at 1218.

Another way is to "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1220 n.6 (citation omitted). "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things . . . systematically better treatment of similarly situated employees . . . ." *Lewis v. City of Union City,* 934 F.3d 1169,

1185 (11th Cir. 2019) (citation omitted).  Importantly, under a "convincing mosaic" theory, the plaintiff "do[es] not [have to] meet this Circuit's strict definition of similarly situated comparators." *Id.* at 1187.  Even where the comparator had "altogether different conditions," he was disciplined "years apart," and he was subject "to altogether different personnel policies," *Lewis*, 918 F.3d at 1230, a reasonably jury could find the better treatment of a similar employee "not irrelevant," *Lewis*, 934 F.3d at 1187.

Here, under a mosaic theory, evidence of Golden's misconduct and how the department addressed his misconduct was "not irrelevant" to whether the department intentionally discriminated against Mercer on the basis of race.  Like Mercer, Golden was a department supervisor.  And like Mercer, Golden's misconduct was not insubstantial—he repeatedly had department employees perform labor at his father's house with department equipment and then instructed them to lie about this misappropriation of state resources.  Although Golden's misconduct occurred on multiple occasions and involved deceit, he was not fired; instead, he was merely suspended for thirty days.  A reasonable jury could infer from these facts that the department intentionally discriminated against Mercer because, as the district court put it, it was "evidence that [the department] suspended but did not terminate a white employee for arguably *worse* conduct."

Because evidence of Golden's misconduct and punishment was relevant to show the department's discriminatory intent—the ultimate issue at trial—the district court did not abuse its discretion

in letting the jury hear about it. "This is not one of those rarest of situations" where we will second guess the district court's balancing of the rule 403 factors. *See Lopez*, 649 F.3d at 1248.

### Judgment as a Matter of Law

The department also argues that the district court erred in denying its motions for judgment as a matter of law. This was error, the department maintains, because there was no evidence supporting the jury's verdict that race was a motivating factor in its decision to terminate Mercer.

We review de novo the district court's ruling on a Federal Rule of Civil Procedure 50 motion for judgment as a matter of law and apply the same standard as the district court. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004). Judgment as a matter of law is appropriate "when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Id.* (citing Fed. R. Civ. P. 50). We view the trial record in the light most favorable to the nonmoving party, draw all reasonable inferences in that party's favor, and ignore all evidence favorable to the moving party that the jury need not believe. *Id.* at 1192–93 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148–51 (2000)).

Here, there was legally sufficient evidence supporting the jury's finding that race was a motivating factor in Mercer's termination. We reach this conclusion based on four inferences from the trial evidence.

First, there was evidence that the department treated Golden better than Mercer for, as the district court put it, "arguably *worse* conduct." Golden misappropriated state workers and equipment for a personal task, told his subordinates to lie about it, and was only suspended for thirty days. Mercer, on the other hand, was fired for his misconduct.

Second, Mercer offered evidence that Davis, the division head who made the initial recommendation to fire Mercer and encouraged Cooper—the department director—to fire him, had a history of treating white and African-American employees differently. For example, Davis did nothing to discipline a white employee who showed up to work so drunk he could barely walk, yet he suspended an African-American employee for two weeks for not doing his job properly, leaving work without permission, and falsifying records. Davis would also allow white engineers to serve as acting division engineer when he was gone, but wouldn't allow Perine, the only African-American engineer, to do the same.

Third, although Perine was Mercer's direct supervisor, she was cut out of the decision to terminate him. Unlike the other supervisors involved in Mercer's termination who were white, Perine was African American.

Fourth, there was evidence that Mercer consistently received favorable performance evaluations even when he was supposedly not doing his job. Mercer had never been disciplined by the department before but nevertheless received the harshest discipline possible.

This was sufficient evidence to support Mercer's ultimate burden of persuading the jury that he had been the victim of intentional discrimination." *See Lewis*, 934 F.3d at 1185 ("[C]ircumstantial evidence that would allow a jury to infer intentional discrimination," includes "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." (quotations omitted)). Because the jury's finding that the department had a discriminatory intent was supported by legally sufficient evidence, the district court did not err in denying the department's motions for judgment as a matter of law.

## The Award of Attorney's Fees

Finally, the department contends that the district court erred in awarding Mercer attorney's fees. The district court abused its discretion in doing so, the department argues, because it failed to apply the legal standard required by our decision in *Canup v. Chipman-Union, Inc.*, 123 F.3d 1440 (11th Cir. 1997).

We review the district court's ruling on a motion for attorney's fees for an abuse of discretion. *Id.* at 1442. "[A] district court abuses its discretion if it fails to apply the proper legal standard or to follow proper procedures in making the determination to award attorney's fees[.]" *Gray ex rel. Alexander v. Bostic*, 720 F.3d 887, 899 (11th Cir. 2013) (citing *ACLU of Ga. v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999)). We review de novo whether the district

court relied on incorrect factors in making its decision. *Canup*, 123 F.3d at 1442.

An employee establishes "an unlawful employment practice" if he demonstrates that race "was a motivating factor" for the employment practice, "even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). This is known as a "mixed motive" case. *Canup*, 123 F.3d at 1442. Where an employer establishes in a mixed motive case that it "would have taken the same action in the absence of the impermissible motivating factor," the district court may grant declaratory relief, injunctive relief, and attorney's fees and costs. 42 U.S.C. § 2000e–5(g)(2)(B)(i). But the district court cannot award damages or issue an order requiring the employee's reinstatement. *Id.* § 2000e–5(g)(2)(B)(ii).

In deciding whether to award attorney's fees in a mixed motive case, a district court must consider three factors: (1) "the degree of success obtained by the plaintiff," (2) "the facts of the given case," and (3) "the severity of the defendant's wrongdoing." *Canup*, 123 F.3d at 1444. We conclude that the district court properly considered the three *Canup* factors.

First, the district court considered the degree of success Mercer obtained at trial. The district court explained that the jury's finding that race was a motivating factor in the department's decision was a "victory" for Mercer "on a significant legal issue that furthers a public goal." The district court wrote that this success weighed in favor of "exercis[ing] its discretion to approve an award of attorney's fees and costs." But the district court recognized that

the degree of Mercer's success wasn't absolute, given the jury's finding that the department would have fired him for race-neutral reasons even if it hadn't considered his race.  The district court concluded that although declaratory and injunctive relief were available to Mercer, it would exercise its discretion to not grant that relief.  Because the district court considered the degree of Mercer's success at trial, it took the first *Canup* factor into account in awarding him attorney's fees.

The district court also considered the facts of the case, as required by the second *Canup* factor.  The district court found that "[t]his was a hard fought case" that lasted "for the better part of a week."  The district court explained that it was awarding Mercer attorney's fees only "[a]fter careful consideration of the record" and "the unique circumstances" of the case.  The district court also said that the jury found that race was a substantial motivating factor in Mercer's discharge.  "In the court's view," the district court opined, "the jury was right."  The record shows that the district court considered the facts elicited at trial, the jury's verdict, and its agreement with that verdict based on its own view of the evidence.  The district court's analysis therefore satisfied the *Canup* test's second factor.

Finally, the district court considered the severity of the department's wrongdoing.  The district court agreed with the jury's finding that the department took Mercer's race into account in firing him.  "[S]ubstantial" racial animus, the district court concluded, played a role in Mercer's termination and—as required by *Canup*—

considered this misconduct in weighing Mercer's request for attorney's fees.

In short, *Canup* requires a district court to consider three factors in deciding whether to award attorney's fees in a mixed motive case, and the district court considered those three factors. We said in *Canup* that the district court "is in the best position to evaluate the effect the facts of a given case should have on the fee request." *Id.* at 1444. Here, the district court considered the degree of Mercer's success, the facts of the case, and the severity of the department's wrongdoing in taking Mercer's race into account. Because the district court's "analysis was proper" and applied the right legal standard, its grant of attorney's fees to Mercer "did not constitute an abuse of discretion." *See id.*

The department argues that the district court abused its discretion because it applied the wrong legal standard. In its order awarding fees, the district court cited to the Tenth Circuit's decision in *Gudenkauf v. Stauffer Communications, Inc.*, 158 F.3d 1074, 1082 (10th Cir. 1998) for the proposition that some redress for Mercer was appropriate to avoid sending "a message that a little overt sexism or racism is okay, as long as it was not the only basis for the employer's action." This was error, the department maintains, because in *Canup* we said that there was no presumption that a plaintiff in a mixed motive case should get attorney's fees, 123 F.3d at 1442–44, while the Tenth Circuit in *Gudenkauf* concluded that a plaintiff in a mixed motive case should ordinarily get attorney's fees in all but special circumstances, 158 F.3d at 1081. The

department contends that we should reverse because the district court failed to apply the *Canup* standard and instead applied the Tenth Circuit's presumption of attorney's fees.

We disagree. The district court recognized that it was bound by the *Canup* test and applied the three *Canup* factors to Mercer's request for attorney's fees. Although the district court cited to *Gudenkauf* for the proposition that Mercer had won a victory on a "significant" legal issue and that it would not condone even a "little" racism, the district court did not apply the Tenth Circuit's standard, did not presume that Mercer was entitled to fees, and did not fail to apply the standard provided by *Canup*. Rather, its award of attorney's fees was based on "the unique circumstances of this case"—consistent with the three-factor analysis required by *Canup* in a mixed motive case.

In sum, the district court applied the correct legal standard, weighed the three *Canup* factors, and concluded that those factors weighed in favor of awarding attorney's fees. We have no basis on this record to disturb or redo that weighing. Finding no abuse of discretion, we affirm the district court's award of attorney's fees.

**AFFIRMED.**